# Exhibit 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Syngenta Seeds, LLC,

        Plaintiff,

  vs.

        **CASE NO. 0:20-CV-1428**

        **SECOND AMENDED COMPLAINT**

Todd Warner, Joshua Sleper, Farmer's
Business Network,

        Defendants.

Plaintiff Syngenta Seeds, LLC ("Syngenta"), by and through its undersigned attorneys, as and for its Complaint against Defendants Todd Warner ("Warner"), Joshua Sleper ("Sleper"), and Farmer's Business Network, Inc. ("FBN," collectively with Warner and Sleper, "Defendants"), hereby alleges as follows based on knowledge of Syngenta's own actions, and on information and belief as to all other matters:

## NATURE OF THE ACTION

1.    This case is about Farmer's Business Network's improper and illegal efforts to replicate Syngenta's technology and business processes.

2.    Syngenta recently discovered that, back in 2019, Defendants hatched a plan to steal Syngenta confidential information to give FBN an unlawful head start in its research and development processes. The scheme involved FBN's coordinated efforts with then-current Syngenta employees, who breached their non-compete

and confidentiality obligations by using and disclosing confidential information to FBN in order to formulate a copycat seed development program.

3.      FBN is a start-up business with aspirations to develop a high-tech, proprietary seeds business. The establishment of a seed breeding program, however, takes years of on-going and intensive investment and efforts. As described below, a successful breeding program, like that at Syngenta, involves evaluating millions of genetic lines, identifying quickly the highest potential lines from this vast expanse, breeding genetic lines and evaluating the progeny, maintaining enormous databases of information to track all of this work, and then repeating these processes again and again to develop even a handful of commercial products.

4.      Seed breeding programs and the data they produce are enormously valuable. The processes by which the biotechnological development occurs require many years of work with the support of digital and genetic tools, as well as an enormous investment of capital. Syngenta carefully protects this information as confidential and/or trade secret, as it provides Syngenta with a competitive advantage in the marketplace.

5.      FBN could have invested significant time and money in attempting to independently develop its own breeding programs and products. But it did not; instead, it chose to steal it.

6.      Beginning in 2019, FBN colluded with at least two, then-current Syngenta employees who were intimately involved in Syngenta's seeds breeding

activities, who had access to and knowledge of Syngenta's current and contemplated breeding programs, and who Syngenta had trusted with some of its most competitively sensitive information. Over the ensuing several months, FBN dangled the prospect of new jobs in front of these employees, causing the employees to take and/or disclose vast amounts of confidential Syngenta data for the benefit of FBN.

7.     Syngenta brings this action to stop the Defendants from engaging in unfair and unlawful behavior that damages Syngenta and the marketplace.

### THE PARTIES

8.     Plaintiff Syngenta Seeds, LLC, is a Delaware limited liability company, with a principal place of business and corporate headquarters located at 2001 Butterfield Road, Suite 1600, Downers Grove, Illinois 60515. Syngenta Seeds is a wholly owned subsidiary of Syngenta Corporation, a Delaware corporation with a principal place of business and corporate headquarters located at 3411 Silverside Road, Suite 100, Shipley Building, Wilmington, Delaware 19810. Syngenta Seeds, LLC, was formed in 2015 as the operative entity following a conversion in which the Delaware corporation Syngenta Seeds, Inc., converted into Syngenta Seeds, LLC. Syngenta Seeds, LLC is deemed to be the same entity as Syngenta Seeds, Inc. and thus is a party to its agreements.

9.     Syngenta is a global science-based agtech company that helps farmers grow safe and effective foods. It is a leading developer and producer of seeds and crop protection innovations, including hybrid varieties and biotech crops.

-3-

Syngenta's scientists constantly improve plant varieties and its seed through breeding to enhance precise plant characteristics. Seed genetics are the lifeblood of Syngenta's business and Syngenta spends millions each year on its research and development efforts.

10.     Defendant Todd Warner is a resident of Minnesota, with his address at 3883 Canter Glen Drive, Eagan, Minnesota 55123.

11.     Warner is a former employee of Syngenta. Warner was a leader in Syngenta's research and development division, working with Syngenta since March 1994. Most recently, Warner served as Head of Field Analytics. In that role, Warner had access to Syngenta's confidential and trade secret information, including development and deployment of trial design, spatial analytics, and statistics to improve trialing and breeding processes across Syngenta's global seed business. In this role, Warner worked in close partnership with data, analytics, phenomics and trialing experts in the regions and global functions to quickly implement new experimental designs, novel algorithms, and technologies.

12.     Defendant Joshua Sleper is a resident of Minnesota, with his address at 1711 Pleasant Avenue, South Saint Paul, Minnesota 55075. Defendant Sleper is a former Syngenta employee and a current FBN employee. In his role as a research and development scientist at Syngenta, he worked on Syngenta's Genomic Prediction Team, which focuses on delivering novel validated genomic prediction methods and tools for analysis. The Genomic Prediction works with Syngenta's

deployment of tools and strategies to accelerate genetic gain by improving prediction accuracy, shortening breeding cycles, and enhancing its advancement decisions to final product placement. In his roles at Syngenta, Sleper also had access to Syngenta's confidential and trade secret information.

13. Defendant Farmer's Business Network, Inc. is a Delaware corporation with its principal place of business in San Carlos, California. On or around December 7, 2020, FBN announced its new Independent Breeding Network where it will be providing breeders with "germplasm resources, data and technical support from the *FBN* team, and with clear paths to commercialization." https://www.businesswire.com/news/home/20201207005649/en/FBN-Launches-Groundbreaking-Independent-Seed-Breeder-Network. It also was reported that FBN executed a pilot program in the 2020 season to test germplasm and try out breeding combinations from initial network members. https://agfundernews.com/fbn-launches-on-farm-rd-network-for-biologics-to-perform-real-world-trials.html.

## JURISDICTION AND VENUE

14. This is a civil action for trade secret misappropriation arising under federal law in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. ("DTSA"); trade secret misappropriation in violation of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-152 et seq.; breach of contract under the common law of the State of North Carolina; tortious interference with contract

under the common law of the State of North Carolina; unfair competition under California law; and civil conspiracy.

15.     The Court has federal-question jurisdiction because the DTSA claim arises under federal law and federal law creates a private cause of action. The Court has supplemental jurisdiction over the state-law claims because they are supplemental to the federal claim under 28 U.S.C. § 1367.

16.     This Court has personal jurisdiction over Sleper and Warner because they are citizens of and reside in the State of Minnesota. The Court has personal jurisdiction over FBN because it is registered to conduct business in Minnesota under Minnesota law and because it committed the improper acts alleged below in the State of Minnesota.

17.     In addition, the Court has personal jurisdiction over Defendants because they entered into a conspiracy and, as described below, one or more of the conspirators undertook acts in Minnesota in furtherance of the conspiracy.

18.      Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Minnesota.

## **FACTUAL BACKGROUND**

I.     **Syngenta's Business, Confidential Information, and Trade Secrets**

19.     Syngenta's seeds business focuses on its ability to provide products that solve the key problems that our farmer customers face. A key part of developing such products is access to data on germplasm and traits, including

genotypic, pedigree, phenotypic, environmental and management pipeline and performance data, along with knowledge of key innovative plant breeding technologies and processes. Syngenta spends millions of dollars on R&D each year to develop advanced seed technologies that help to feed America and the rest of the world.

20.     Plant breeding is the process of deliberately interbreeding (i.e., crossing) related individuals (often called parents) to produce new crop varieties or lines with desirable properties (often called progeny). For example, a mildew-resistant parent may be crossed with a high-yielding but susceptible parent with the goal of a new progeny line that is mildew-resistant and high-yielding.

21.     Today, Syngenta's plant breeding activities are more precise and faster than ever, as a result of its large and longstanding investments in research and development. Syngenta's breeding processes and technologies are maintained in confidence by Syngenta.

22.     Crossing two parent plants will often generate multiple progeny (ranging from a few to hundreds). Each progeny plant will then be evaluated for desirable phenotype (or physical characteristics), with select progeny plants being evaluated for several years and across a wide range of environments. Using this lengthy and intensive process and detailed technology, Syngenta is able to identify and select the best progeny plants for release as seed, for use in hybrid seed production, or use as germplasm (i.e., as a parental line in further breeding efforts).

23.     Syngenta's germplasm is the basic building block on which Syngenta builds its entire catalogue of seeds. Syngenta's germplasm includes its entire catalogue of seeds, including seeds of millions of different varieties. Syngenta maintains detailed genetic data on each of the parental and hybrid seed lines in its catalogue of seeds. Syngenta does not publicly disclose information about Syngenta's hybrids, including which parents are crossed to produce a particular hybrid.

24.     To execute its cutting-edge research-and-development process, Syngenta maintains detailed, confidential information regarding, for example: pedigree information; genetic maps; stage in pipeline; performance (yield) data; general combining ability of early-stage lines; molecular marker (genotyping) data; data generated from pan-genomic analytics using DNA sequence data; trial data; results of analytics; characterization of Syngenta's proprietary Family Based Association Mapping; genetic modifications of seeds; integration of genetic modifications into Syngenta's germplasm; seed breeding processes and procedures; seed testing data; strategic plans for future lines of seeds; and the performance of certain current and future products. (Generally, the "Syngenta Confidential Information.")

25.     Syngenta's primary seeds research facility is located in Research Triangle Park, North Carolina. The primary leaders of Syngenta's R&D team either reside in North Carolina and work in Syngenta's North Carolina facility or travel to

North Carolina regularly. For the purposes of his work for Syngenta, Sleper engaged daily with Syngenta research and development employees located in Raleigh, North Carolina, and would at times travel to Syngenta's Raleigh research facility, including as recently as January 2020.

26.     Over the last twenty years, Syngenta has expended a considerable amount of time and effort and large sums of money to develop the Syngenta Confidential Information. The result of those efforts is a diverse and valuable germplasm pool and commercially valuable seeds.

27.     Syngenta's global germplasm produces genetics tailored to a variety of local growing conditions. With its considerable data regarding its germplasm, Syngenta is able to breed seeds producing plants with specific traits, allowing farmers to buy seed optimized for their soil types, insect pressure, disease issues, and other local growing conditions. And with a considerable catalogue of germplasm pool from which to draw, Syngenta is positioned to develop seeds that will produce exceptional yields from region to region and farm to farm.

28.     Syngenta's researchers develop and analyze over 1 million new genetic lines and hybrids annually. Through its detailed research-and-development process, Syngenta identifies and selects top-performing hybrids. Syngenta has developed genetics that produce hybrids whose yields consistently outperform Syngenta's competitors.

29.     Syngenta's breeding programs, resulting in exceptional proprietary data and proprietary genetics, along with its ability to efficiently incorporate outstanding traits from the Syngenta germplasm into new inbred lines and hybrids, give Syngenta a material competitive advantage over other market participants. Syngenta optimizes this advantage by leveraging the highly confidential Syngenta data and information through its proprietary analytics framework. This information is used to deploy technologies and allocate resources to maximize the rate of genetic gain in Syngenta's proprietary breeding programs

30.     Syngenta Confidential Information also includes the proprietary methods by which Syngenta, through leveraging its highly confidential data and information, has materially accelerated its breeding process beyond industry standards in order to capitalize on genetic enhancements more quickly, giving Syngenta further competitive advantage in developing new and better products over other market participants.

31.     Syngenta Confidential Information also includes Syngenta's internal modeling techniques and cost-optimization strategies for implementing its research-and-development processes, as well as its internal financial information outlining how costs are allocated to various research and development initiatives, which creates value for Syngenta by helping it efficiently allocate resources for maximum productivity.

## II.    Warner and Sleper Had Access to and Agreed to Keep Confidential Syngenta Information

32.    In November 2012, in exchange for a pay raise, Warner entered into an Employment Agreement Concerning Confidentiality, Proprietary Rights and Restrictive Covenants (the "Employment Agreement"). The Employment Agreement contains a non-competition provision and confidentiality obligations. The Employment Agreement is governed by North Carolina law.

33.    Likewise, in July 2013, as a condition for employment with Syngenta, Sleper executed an Employment Agreement that is identical to that signed by Warner.  Sleper's Agreement incorporates his 2012 Syngenta Confidentiality and Proprietary Rights Agreement, which defines confidential information to include both Syngenta Confidential Information, as well as other non-public information to which he had access.  (Confidentiality and Proprietary Rights Agreement, para. 4.)[1]

---

[1] Paragraph 4 of the Confidential and Proprietary Rights Agreement states, in relevant part, that "During the term of employment, and thereafter, Employee will not, except as required in work assigned Employee by the Company, directly or indirectly, use for Employee or others, or publish, or disclose to any third party any information, knowledge or data relating to the Company, its predecessors or affiliates or to any third party business contact of the Company, such as a customer or potential customer of the Company, as well as any other information, knowledge, or data owned or controlled by or in possession of the Company, its predecessors or affiliates (whether utilized by the Company, its predecessors or affiliates and whether or not obtained, acquired or developed by Employee) or disclosed to the Company, its predecessors or affiliates or Employee by a third party during the term of employment with Company or any of its predecessors or affiliates (hereinafter "Confidential Information"). Confidential Information includes, but is not limited to: product or service information, including product formulations; fees, costs and pricing structures; distribution and sales methods and systems; sales and profit figures; marketing information; advertising and pricing strategies; analyses;

34.     Based on the terms of their employment, Warner and Sleper's access to Syngenta Confidential Information was conditioned on the requirement that they use the information to further Syngenta's business interests alone.

35.     Under the Employment Agreements, Warner and Sleper agreed that during their employment, they "shall not, directly or indirectly, as principal, agent, consultant, trustee or through the agency of any corporation, partnership, association, or agency, engage in the 'Business,' as defined in paragraph 13."[2] (Employment Agreement ¶ 5(c).)

---

diagrams; reports; computer software, including operating systems, applications and program listings; flow charts; manuals and documentation; databases; accounting and business methods; business plans; innovations, designs, ideas, inventions and new developments and methods, whether patentable or unpatentable and whether or not reduced to practice; trade secrets; manufacturing know-how; raw material and product specifications; analytical techniques; quality control tests and procedures; proprietary information; customer lists; existing and prospective clients, distributors, agents, suppliers and customers and other information related thereto; and all similar and related information in whatever form."

[2] "Business" is defined to include: "[A]ny business service, or product engaged in, provided, or produced by the Company and/or its Affiliates that Employee assists with, or accesses confidential information regarding, from the date of this Agreement to the date of the termination of employment, including, but not limited to, the research, development, production, commercialization, marketing, sale and regulatory requirements of chemical, seed and agricultural input products and services for the agricultural industry which include, without limit, the following: lawn and garden chemical, seed and input products, professional pesticide products, seed care products, seed treatment application technology, seed treatment equipment, fungicides, herbicides and insecticides, agricultural input products, seed and trait products that are marketed to growers, food, fuel and feed processors and the distributors, agents and retailers who serve them." (Employment Agreement ¶ 13.)

36.     The Employment Agreements included a provision requiring Warner

and Sleper not to disclose confidential information:

> Employee covenants and agrees that (i) the Employee shall keep and
> maintain the Confidential Information in strictest confidence, and (ii)
> the Employee shall not, except as required in work assigned Employee
> by the Company, directly or indirectly, use for Employee or for others,
> or publish, or disclose to any third party any information, knowledge or
> data relating to the Company, its predecessors or affiliates or to any
> third party business contact of the Company, such as a customer or
> potential customer of the Company, as well as any other information,
> knowledge or data owned by, controlled by or in the possession of the
> Company, its predecessors or affiliates (whether or not utilized by the
> Company, its predecessors or affiliates and whether or not obtained,
> acquired or developed by Employee) or disclosed to the Company, its
> predecessors or affiliates or Employee by a third party during the term
> of employment with Company or any of its predecessors or affiliates.

(Employment Agreement ¶ 6(a).)

37.     Likewise, Warner and Sleper each promised upon termination to

return any Syngenta information:

> All documents and tangible things embodying or containing Confidential
> Information are the Company's exclusive property. Upon termination of
> employment, Employee shall deliver to the Company all materials and
> copies thereof, including, but not limited to, writings, records, data,
> photographs, memoranda, manuals, handbooks, contracts, orders, sales
> literature, price lists, customer lists, data processing materials, software
> programs, manufacturing and production materials and any other
> documents, whether or not obtained from the Company, which pertain
> to the Company, contain Confidential Information or were received or
> used by Employee in connection with employment by the Company.
> Termination of employment shall not affect the obligations of Employee
> which, pursuant to the express provisions hereof, continue in effect.
> Modification or change of Employee's duties by the Company shall not
> affect Employee's continuing obligation to fully observe the provisions
> of this Agreement.

(Employment Agreement ¶ 14(a).)

38.      In addition to their Employment Agreements, Warner and Sleper underwent training on Syngenta policies and procedures over the course of their employment. In particular, they underwent training on confidentiality of Syngenta's information and proper handling of confidential, trade secret information.

39.      In carrying out their roles at Syngenta, Warner and Sleper had access to massive amounts of Syngenta Confidential Information that Syngenta had compiled over the course of decades. In their roles, Warner and Sleper were expected to use this trove of Syngenta Confidential Information in their research and analysis to innovate new-and-improved corn and soybean seed offerings—the cornerstones of Syngenta's products—in order to further strengthen Syngenta's competitive advantage in the marketplace.

40.      For instance, Warner had access to competitively sensitive information, including trade secret information, related to Syngenta's considerable efforts to develop hybrid corn seeds to be used in drought-prone regions. Developing hybrid corn lines for use in challenging environments, like drought-prone regions, is a priority for Syngenta, and Syngenta's success in this field constitutes a significant advantage for Syngenta.

41.      As Head of Field Analytics, and in his former role as Head of Quantitative Breeding Data Management and Analysis, Warner managed dozens of ongoing Syngenta genetic projects, including experimental breeding, seed testing, data, analysis, trialing, and results.

42.     Warner was one of four members of Syngenta's Quantitative Breeding Leadership Team. In that role, Warner had access not only to Syngenta's current genetic projects, but also to Syngenta's broader, long-term strategic plan and the roadmap for Syngenta's future.

43.     Warner and his team of researchers were the engine responsible for developing the underlying infrastructure on Syngenta's North American corn seeds, including detailed and thorough genetic analyses. Warner was also privy to confidential information regarding Syngenta's seed breeding strategy.

44.     Sleper was one of the scientists who worked on Warner's team during Sleper's entire tenure at Syngenta. Sleper's duties gave him access to confidential information, including both confidential information as defined in his employment agreement and Syngenta Confidential Information as described above. For instance, Sleper had access to confidential information regarding how Syngenta deploys technologies and allocates resources to maximize the rate of genetic gain in Syngenta's proprietary breeding programs. He also had unlimited access as a scientist in the Syngenta quantitative breeding/analytics team to data on germplasm and traits, including genotypic, pedigree, phenotypic, environmental and management pipeline and performance data that would be instrumental in FBN's efforts to create a "copycat program."

### III.     Defendants Hatch a Plan To Steal Syngenta's Confidential Information

45.     In early 2019, and unbeknownst to Syngenta, Warner and Sleper met with Syngenta's competitor FBN about leaving Syngenta and jumpstarting FBN's R&D seed department using Syngenta Confidential Information.

46.     No later than May 2019, Warner began communications with the then-head of FBN's nascent Seed R&D Department, Ron Wulfkuhle. Wulfkuhle was a former Syngenta employee. During those discussions, Warner made clear that he was interested in developing a strategy for FBN to assist it in developing a seed genetics program. Wulfkuhle made it clear that FBN was very interested in having Warner develop a seed genetics program on its behalf.

47.     On May 23, 2019, Warner wrote to FBN emphasizing that he was willing to use the confidential information and experiences learned at Syngenta for FBN's benefit:

> I am very interest[ed] in the opportunity to setup a cutting edge molecular breeding and modeling team to help drive breeding and new product development. Over the past 25 years of my work experience, in breeding and product development. I have learned a lot about what works and what doesn't. As well as how breeding needs to evolve as opposed to how traditional companies conduct breeding today.
>
> If your schedule permits it would be great to travel to Sioux Falls and meet with you in person. For that meeting Joshua Sleper would join me. We together as a team have developed new trial design, trial analysis, and molecular breeding systems being implemented at Syngenta today. Albeit not at the speed that needs to take place.
>
> After a short visit with Dan yesterday, it's clear we need to get started to get things moving as fast as possible to develop new germplasm to support FBN farmers.

(FBN000075.)[3]

48.     Warner expressly admitted, and FBN knew, that the "trial design, trial analysis, and molecular breeding systems" Warner and Sleper developed were created while employed at Syngenta, for Syngenta's benefit, and using Syngenta's confidential information. Despite those obvious admissions that Warner and Sleper would be bringing Syngenta-developed confidential information, FBN was undeterred in seeking out a collaboration and partnership with the Syngenta employees. In fact, even while still employed at Syngenta, Warner recognized the need to "mov[e] fast" to support "FBN farmers."

49.     Wulfkuhle, Warner, and Sleper scheduled a meeting at a restaurant in Albert Lea, Minnesota for June 12, 2019. In preparation for the meeting, Warner told Wulfkuhle that: "We could share the vision about how we can jump start early stage breeding at FBN that exploits new technology implementation, collaborations, and what it will take to succeed. Having and developing a shared vision and understanding, at the start, is a key point in delivering value as soon as possible." (FBN0000742.)

50.     The meeting in Albert Lea lasted a couple of hours and, upon information and belief, Warner and Sleper provided FBN with Syngenta Confidential

---

[3] FBN produced documents pursuant to Rule 45. FBN marked various documents as "attorneys eyes only," including communications between FBN, on one hand, and Warner and Sleper, on the other hand, even while Warner and Sleper were still employed by Syngenta.

Information. Wulfkuhle commented internally within FBN that Warner and Sleper provided "great ideas about how to bring genomics and phenomics concepts to life within a breeder network to outperform the multinationals" [like Syngenta] and that he now understood why "Dan [Dyer] made this recommendation [to speak with them]." (FBN0000707.) Again, despite the unambiguous indication that Warner and Sleper would be bringing a Syngenta-developed breeding program, FBN continued in its pursuit of Warner and Sleper.

51.     After the Albert Lea meeting, FBN knew that Warner and Sleper's Syngenta knowledge would make the difference in establishing FBN's breeding program. To that end, Wulfkuhle reiterated FBN's interest in them, writing:

> I very much appreciate your passion and desire to uncover and implement novel and faster approaches to breeding improvement.

> In the meantime, I hope you can think about your ideal role profiles and when you've had a chance to pull together I'd look forward to discussing.

(FBN0000706.)

52.     Later that day, Sleper got right to work on FBN's breeding program. He accessed Syngenta information, including information that Syngenta deemed confidential and/or trade secret. Specifically, he accessed information related to breeding values and genotyping, both of which bear directly on the process to start a seed breeding program. Sleper accessed this information to use for his own purposes.

53.     The next day, on June 13, 2019, Sleper accessed Syngenta information, including confidential and/or trade secret information, regarding early-stage breeding practices at Syngenta. In particular, the early-stage breeding information, as its name suggests, lends insight into the most efficient way Syngenta had developed its breeding program.  Sleper accessed this Syngenta information to use for his own purposes.

54.     On June 17, 2019, while still employed full-time at Syngenta, Warner and Sleper wrote Wulfkuhle again, in a new email with the subject line "Seed R&D Plans." In particular, Warner provided information about how to create a "modern, efficient breeding program" and disclosed Syngenta confidential cost structures to implement the plan. (FBN0000752.)

55.      Included in the email was an eight-page PDF entitled "BreedingPlanCosts." The PDF included slides regarding "How do we accelerate Genetic Gain?," which was a detailed blueprint of how to copy Syngenta's breeding program quickly. The PDF included detailed Syngenta Confidential Information about developing germplasm and accelerating genetic gain beyond industry standards, a hallmark of Syngenta's competitive advantage. Warner and Sleper's bottom line with the information: FBN could be competitive and save tens of millions of dollars **per year** by following the plan they copied from Syngenta. The plan Warner and Sleper presented was based on the millions of dollars spent, and decades of investments made, by Syngenta in developing its seed breeding program.

56.     The concepts contained in the "BreedingPlanCosts" document are, in part, a copycat of the early-stage breeding concepts Sleper accessed on June 13, 2019. On information and belief, Sleper was accessing Syngenta's confidential early-stage breeding information at the same time he was developing the "BreedingPlanCosts" program for his own and FBN's benefit. The "BreedingPlanCosts" document contains confidential, trade secret protocols that illustrate how Syngenta has optimized its breeding plan to achieve efficiencies that are unique in the hybrid-seed-development market.

57.     Throughout the summer and fall of 2019, Sleper and Warner continued to be in contact with FBN, discussing the status of FBN's plans to build its R&D department. FBN reassured them that they were still very interested in proceeding, and that they were about to onboard Dan Dyer—another former Syngenta employee—who would be helping to lead FBN's breeding efforts out of FBN's Canadian office. Once that occurred, FBN anticipated moving forward with Warner and Sleper.

58.     October 17, 2019, Warner and Sleper exchanged text messages showing how they abused their access to Syngenta Confidential Information for the benefit of FBN, including reviewing records to identify seed lines for FBN to use to compete with Syngenta. Below is a recreation of that text conversation based on Syngenta's review of Warner's phone records.



59.     Then, later that same day, Sleper messaged Warner suggesting that they mine more Syngenta Confidential Information for FBN. Below is a recreation of that conversation based on Syngenta's review of Warner's phone records.



60.     Based on the foregoing conduct alone, Warner and Sleper systematically identified and removed Confidential Syngenta Information with a

goal of assisting FBN in developing a seed breeding program to compete with Syngenta. Warner and Sleper's actions were done both during and after their employment at Syngenta.

## IV. Warner and Sleper Continue to Provide FBN With Syngenta Confidential Information during Interview Process

61.     In late 2019, Warner began interviewing at FBN for the position of Head of Breeder Analytics. Later, in early January 2020, Warner interviewed with FBN's newly installed Head of Seed R&D Department, Dan Dyer, another former Syngenta employee.

62.     Shortly after Warner's January 2020 interview, FBN employees presented a breeding plan to the FBN Chief Executive Officer and Chief Financial Officer. On information and belief, the presentation to FBN contained Syngenta Confidential Information provided by Warner and Sleper, including the BreedingPlanCosts PDF.

63.     In early February 2020, Warner traveled to FBN. After that trip, FBN emailed to set up further discussions about Warner's role. In response, Warner wrote in part, that he was focused on the germplasm which he described as "critical" to the development of a seed breeding program. (FBN0000137.)

64.     On February 12, 2020, just a few days after his interview with FBN, Warner accessed a highly sensitive file named "2012 TP NAM and TMPV.xlsx" (the "Drought File"). The Drought File was not on Warner's Syngenta-issued laptop.

65.     Based on forensic evidence, Warner accessed the Drought File from a separate external storage device. On February 12, Warner inserted an Alcor Micro Corp. external USB mass storage device (the "Alcor Micro Drive") into his laptop.

66.     The Drought File contains trade secret information regarding Syngenta's drought trialing network, including trialing locations and types of water treatment (e.g., irrigated vs. dryland). The Drought File also contains identifiers which, if combined with other Syngenta Confidential Information, would provide insights on trial data with respect to environmental conditions and the ultimate results of Syngenta's drought trials.

67.     The information on the Drought File would cause considerable competitive harm if provided to one of Syngenta's competitors, including FBN.

68.     Although Syngenta asked Warner to return the Alcor Micro Drive, he has denied any knowledge of its whereabouts and has not returned the Alcor Micro Drive to Syngenta.

69.     Between the time Sleper began his contact with FBN and his departure from Syngenta, including in April 2020 shortly before announcing his resignation, Sleper inserted external USB storage devices into his Syngenta-issued laptop. While he had external USB storage devices inserted into his Syngenta-issued laptop, Sleper accessed Syngenta information – information that pertained to the company, information that was confidential, and/or information that was used or received by Sleper in connection with his employment.  On at least two occasions, including in

-23-

April 2020, Sleper navigated between his local hard drive and the external USB storage devices, behavior consistent with copying data. Sleper did not leave any USB devices in his office upon departure, and has not returned any external USB storage devices to Syngenta.

70.     On March 13, 2020, Warner loaded several folders of documents from his Syngenta-issued laptop to the Western Digital Drive. The source of the files on his laptop was a folder named "PersonalData." Warner created the following file path on the Western Digital Drive: "/Todd/Projects." Within the "Projects" folder, Warner placed highly confidential Syngenta documents relating to genetic validation testing, genetic clustering, general combining ability, heterotic classes, and other historical and ongoing genetics projects in corn and soybean breeding.

71.     Warner used at least four other external drives in rapid succession with his Syngenta laptop on March 16, 2020. Although Warner recognized that connecting four external drives in rapid succession is "odd," he disclaimed any knowledge or recollection of connecting the external drives to his laptop.

72.     On April 24, 2020, Sleper announced his resignation from Syngenta, effective May 1, 2020.

73.     In early May, FBN offered Warner a job as Head of Quantitative Breeding.

74.     On May 23, 2020, Warner gave Syngenta notice of his resignation.

75.     Until they resigned their Syngenta employment, Warner and Sleper were entrusted with access to Syngenta Confidential Information.

76.      Although Syngenta asked Warner to return the Alcor Drive and the other four external drives, he has denied any knowledge of their whereabouts and has not returned the them to Syngenta. In reviewing the information that was copied, Warner and Sleper appear to have downloaded Syngenta Confidential Information as well as trade secret information. Some examples of the information taken include:

   a. Collection of trade secret information about Syngenta corn and soy germplasm. This information, as well as the combination of information, is secret and has value because it is secret.

   b. Datasets about Syngenta's North America breeding program for corn and soy.

   c. Syngenta germplasm information, including information about seed pedigree, genetic maps, the pipeline state of the seeds, performance (yield) data, general combining ability of early-stage lines, molecular marker (genotyping) data, and additional genotyping data generated from pan-genomic analytics using DNA sequence data.

   d. Corn drought program for Syngenta Artesian product pipeline, including trial data, results of the analytics, and important germplasm information such as pedigree information.

   e. Syngenta trial information from 2011-13, including locations, planting dates, and annotation of the trials using an internal environmental classification system which enables GxE analytics (genetics by environment) that assess the performance of germplasm in different environmental conditions.

## V.     Syngenta Undertakes Reasonable Efforts to Protect its Trade Secrets and Confidential Information.

77.     Syngenta undertakes reasonable efforts to protect the Syngenta Confidential Information from improper acquisition, disclosure, and/or use. Some examples of measures that Syngenta takes include, without limitation: securing its buildings via physical measures, such as by requiring key cards and limiting visitor access; storing confidential materials like the germplasm, hybrid, and other genetic information on secure servers; requiring Syngenta employees to sign a non-disclosure agreement upon joining the company and to formally re-acknowledge their confidentiality obligations if and when they depart; conducting an annual training on confidentiality; using non-disclosure agreements with third parties before providing confidential information; and restricting access to Syngenta Confidential Information on a need-to-know basis.

78.     Syngenta utilizes cloud-based storage systems, including Microsoft OneDrive and Microsoft Sharepoint. Access to Syngenta's cloud-based storage facilities is limited to Syngenta-issued computers when accessed from within the Syngenta network. And access to various Sharepoint workspaces is limited to those individual employees with a need to access particular workspaces.

79.     Employees also have individual network directories. Employees are expected to maintain work-related files in their personal network directories. Employees do not have access to other employees' network directories.

80.     Syngenta employees, including Warner and Sleper, are required to comply with the United States Employee Handbook (the "Handbook"). The Handbook contains an independent confidentiality provision:

**Confidentiality Agreement**

During your employment with Syngenta, and thereafter, you may not use, or disclose to others, any information deemed by Syngenta to be confidential, proprietary or a trade secret.

If you have any questions regarding the scope of this requirement, you should contact your supervisor or Human Resources representative.

A violation of this policy will likely result in disciplinary action up to and including termination.

If at any time, you are unsure of what is considered information deemed by Syngenta to be confidential, proprietary or a trade secret contact your supervisor, your Human Resources representative or legal.

\*      \*      \*

**CONFIDENTIAL COMPANY INFORMATION**

Employees must exercise the same degree of caution in transmitting Company confidential information on the electronic mail system as with other means of communicating information. Company confidential information should never be transmitted or forwarded to outside individuals or companies not authorized to receive that information and should not be sent or forwarded to other employees inside the Company who do not need to know the information. Always use care in addressing electronic mail messages to make sure that messages are not inadvertently sent to outsiders or the wrong person inside the Company. Employees that transmit Company confidential information to outside individuals or companies should either employ encryption techniques or otherwise ensure the secure transmission of such information. In particular, exercise care when using distribution lists to make sure that all addressees are appropriate recipients of the information. Lists are not always kept current and individuals using lists should take measures to ensure that the lists are current. Refrain from routinely forwarding messages containing Company confidential information to multiple parties unless there is a clear business need to do so.

In order to further guard against dissemination of confidential Company information, employees should not access their electronic mail messages for the first time in the presence of others. Electronic mail windows should not be left open on the screen when the computer is unattended (i.e., utilize screensavers protected by unique passwords).

81.     Syngenta Security Code of Practice: My Information Security Responsibilities ("Security Code of Practice"), also puts Syngenta employees on notice of their confidentiality obligations. The Security Code of Practice sets forth the following obligations:

   a.   Understand and assume your responsibility with regard to Information Security by following required training.

   b.   Create and store Syngenta Information on Syngenta authorized services, systems and devices and apply necessary access restrictions to ensure information confidentiality is preserved in line with handling rules.

   c.   Do not disclose non-PUBLIC information to anyone who is not authorized or does not need to know it.

   d.   Do not work with CONFIDENTIAL or SECRET information in places where it could be overseen or overheard. Avoid accessing CONFIDENTIAL or SECRET information from public/insecure computers, e.g. internet cafes.

   e.   Do not store, copy or exchange CONFIDENTIAL or SECRET information unless adequately secured. Apply special care with portable media, e.g. CDs, USB sticks, smartphones, as they can easily be lost or stolen

   f.   Do not allow or share photos/videos of CONFIDENTIAL or SECRET information, processes, equipment or facilities with unauthorized employees or third parties.

   g.   Use Syngenta computing and information resources and services mainly for business purposes and in line with their intended use. Do not allow use of such resources by family members, company visitors or other third parties unless appropriate authorization, contracts and/or non-disclosure agreements are in place.

-28-

h. Do not introduce, attach or remove computing equipment to Syngenta systems/network without authorization.

i. Return all company materials, including data files and computing equipment (e.g. laptop, mobile phone), upon the end of your employment with Syngenta.

82. Also, The Syngenta Code of Conduct ("Code of Conduct") explains

standards of conduct to which employees are expected to adhere:

**Syngenta respects the property rights of others and vigorously defends its own property rights.**

We will protect all Company assets, property and resources securely and will only apply and use them for the purpose of the Company's business and activities and not for our own personal gain.

We will keep confidential and protect trade secrets belonging to Syngenta or other companies and not make any non-business use of them.

Information generated within Syngenta, including information relating to research and development, manufacturing data, costs, prices, sales, profits, markets, customers and methods of doing business is the property of Syngenta and will not, unless legally required, be disclosed outside Syngenta without proper authority.

83. Further, Syngenta requires employees to acknowledge their

responsibility for complying with Syngenta policies each time they access their

Syngenta computers and the Syngenta network. When logging into their computers,

employees are required to make the following acknowledgment:

Syngenta Code of Conduct and Information Security Responsibilities

The use of this service is governed by the Syngenta Code of Conduct, "My Information Security Responsibilities" and where relevant "Use of

-29-

Cloud-Based Services" Codes of Practice. Usage may be monitored and misuse will result in disciplinary action.

84.     And when Syngenta employees access the secured Syngenta network, they make the following acknowledgment:

> WARNING: You are about to access a controlled system for authorized use only. Unauthorized access or misuse of this system is prohibited and will be prosecuted. Only proceed if you are authorized to use this system as detailed above.

## VI.    Syngenta's Competitors, Including FBN, Would Derive Substantial Competitive Advantages from Knowing Syngenta's Trade Secrets

85.     As described above, Syngenta works hard to develop its innovative and advanced products. Syngenta spends millions of dollars per year developing its products.

86.     As a result of its innovative research and development, Syngenta has been able to enter into licensing arrangements with third parties. Additionally, Syngenta's product offerings are more valuable because they result in higher profits for farmers. The value of the Syngenta Confidential Information, including its proprietary data and proprietary genetics, Syngenta's proprietary seeds breeding programs and procedures, Syngenta's proprietary algorithms, along with information on how the proprietary genetics is used in Syngenta's products, is significant. This information allows competitors such as FBN to create new products for the marketplace without the significant investment required for Syngenta to develop its innovative products.

87.     Although Syngenta patents some of its seed technology, it does not patent its hybrids or disclose information about how they are developed. As a result, competitors have no access to the genetic makeup of Syngenta's hybrids, which Syngenta maintains as trade secret information.

88.     If Syngenta's competitors, like FBN, were to gain access to Syngenta Confidential Information, they would gain an unfair and unearned advantage, as they would, for instance, have access to the highly sensitive and valuable seed technology and data that forms the basis of Syngenta's hybrid offerings.

89.     In particular, if Syngenta's pedigree and other breeding information were misappropriated by a former employee or a competitor, they could recreate a Syngenta commercial hybrid without any breeding investments of their own. The competitor would have insight into Syngenta's breeding and evaluation process, which Syngenta has spent millions of dollars and several years in a development cycle. Competitors would also learn valuable information regarding the placement of these and similar hybrids various markets and responding to different growing environments.

**CLAIMS FOR RELIEF**
**COUNT I: BREACH OF CONTRACT**
**(AGAINST WARNER AND SLEPER)**

90.     Syngenta realleges and incorporates by reference herein the foregoing allegations of the Complaint.

91.     The Employment Agreement is an enforceable contract supported by consideration, and Syngenta has performed its obligations under the Employment Agreements.

92.     Warner and Sleper breached their Employment Agreements by, among other things, taking Syngenta property, Confidential Information, and trade secrets in violation of Sections 6(a) and 14(a).

93.     Warner and Sleper also breached their Employment Agreements by competing, directly or indirectly, with Syngenta while still employees by providing FBN with Syngenta Confidential Information and other information to aid FBN in jumpstarting its Seed R&D Department and saving FBN tens of millions of dollars a year.

94.     By these actions, Warner and Sleper have caused damage to Syngenta. In addition, Syngenta has suffered irreparable harm, including through the loss of its confidential information, and will continue to suffer irreparable harm unless Defendants' conduct is enjoined by this Court.

## COUNT II: VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. 1836(b) (AGAINST ALL DEFENDANTS)

95.     Syngenta realleges and incorporates by reference herein the foregoing allegations of the Complaint.

96.     Syngenta owns and possesses confidential information and trade secrets related to its seed genetics business including, but not limited to, the Syngenta Confidential Information.

97.     Defendants acquired and used or are planning to use the Syngenta Confidential Information under circumstances in which they knew or had reason to know that the Syngenta Confidential Information was obtained without authorization.

98.     The Syngenta Confidential Information is related to products or services used in, or intended for use in, interstate or foreign commerce.

99.     Syngenta has taken reasonable steps to maintain the confidential nature of the Syngenta Confidential Information, including but not limited to the Syngenta Confidential Information that Defendants have misappropriated.

100.    The Syngenta Confidential Information is nonpublic and confidential, is not generally known in the industry or elsewhere, and is not readily ascertainable through proper means by other persons.

101.    The Syngenta Confidential Information derives actual and potential independent economic value from not being generally known to, or readily

ascertainable through proper means by, other persons who might obtain economic value from its disclosure or use.

102.    Defendants' possess the Syngenta Confidential Information without any color of right.

103.    Defendants' actions in misappropriating the Syngenta Confidential Information were done willfully and maliciously.

104.    Defendants' actions violate the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832, et seq.

105.    Defendants' misappropriation of the Syngenta Confidential Information has caused and will cause Syngenta damages in an amount to be determined at trial.

106.    In addition, Syngenta will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent Defendants' misappropriation and threatened further misappropriation, and to prevent the value of the Syngenta Confidential Information from continuing to inure unfairly to Defendants' benefit.

### COUNT III: VIOLATION OF THE NORTH CAROLINA TRADE SECRETS PROTECTION ACT, N.C. Gen. Stat. § 66-153 (AGAINST WARNER AND SLEPER)

107.    Syngenta realleges and incorporates by reference herein the foregoing allegations of the Complaint.

108.    Syngenta owns and possesses Syngenta Confidential Information related to its seed genetics business, as described above. The Syngenta Confidential

Information constitutes trade secrets within the meaning of the North Carolina

Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-152 et seq.

109.  Defendants acquired and used or are planning to use the Syngenta

Confidential Information under circumstances in which they knew or had reason to

know that the Syngenta Confidential Information was obtained without express or

implied authority or consent and was not obtained by proper means.

110.  Syngenta has taken reasonable steps to maintain the confidential

nature of its trade secrets, including but not limited to the Syngenta Confidential

Information that Warner has misappropriated and/or will misappropriate.

111.  The Syngenta Confidential Information is nonpublic and confidential, is

not generally known in the industry or elsewhere, and is not readily ascertainable

through proper means by other persons.

112.   The Syngenta Confidential Information derives actual and potential

independent commercial value from not being generally known to, or readily

ascertainable through proper means by, other persons who might obtain economic

value from its disclosure or use.

113.  Defendants' actions in misappropriating the Syngenta Confidential

Information were done willfully and maliciously.

114.  Defendants' actions violate the North Carolina Trade Secrets Protection

Act, N.C. Gen. Stat. §§ 66-152 et seq.

115.    Defendants' misappropriation of the Syngenta Confidential Information has caused and will cause Syngenta damages in an amount to be determined at trial.

116.    In addition, Syngenta will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent Defendants' misappropriation and threatened further misappropriation, and to prevent the value of the Syngenta Confidential Information from continuing to inure unfairly to Defendants' benefit.

## COUNT IV: TORTIOUS INTERFERENCE WITH A CONTRACT
### (Against All Defendants)

117.    Syngenta realleges and incorporates by reference herein the foregoing allegations of the Complaint.

118.    FBN knew or should have known about the Agreements between Syngenta and Sleper, and between Syngenta and Warner, including because former Syngenta employees Wulfkuhle and Dyer were aware of the agreements.

119.    Warner knew or should have known about the Agreement between Syngenta and Sleper.

120.    Sleper knew or should have known about the Agreement between Syngenta and Warner.

121.    Warner's and Sleper's Agreements were supported by adequate consideration and are enforceable.

122.    FBN has interfered with Warner's and Sleper's obligations to Syngenta as set forth in their Agreements, including Warner's and Sleper's confidentiality obligations and noncompetition obligations.

123.    Warner has interfered with Sleper's obligations to Syngenta as set forth in his Agreements.

124.    Sleper has interfered with Warner's obligations to Syngenta as set forth in his Agreements.

125.    FBN intended to harm Syngenta by interfering with Warner's and Sleper's contractual obligations to Syngenta. FBN intentionally procured the breach of those contractual obligations by discussing Syngenta Confidential Information and accepting Syngenta Confidential Information and other information that would aid FBN in its competition with Syngenta from Warner and Sleper in direct contravention of the non-competition and non-disclosure obligations in their Agreements.

126.    FBN's interference was and is improper and without justification or privilege. FBN interfered with Warner's and Sleper's contractual obligations with the intent of injuring Syngenta and improperly gaining a competitive advantage at Syngenta's expense. FBN has repeatedly targeted Syngenta employees, and FBN continues to use Syngenta Confidential Information obtained to compete unfairly for Syngenta's customers.

127.    Warner intended to harm Syngenta by interfering with Sleper's contractual obligations to Syngenta. He intentionally procured the breach of those contractual obligations in sharing Syngenta Confidential Information with FBN and

using it for FBN's benefit, in direct contravention of the non-competition and non-disclosure obligations in Sleper's Agreements.

128.    Warner's interference was and is improper and without justification or privilege. Warner interfered with Sleper's contractual obligations, with the intent of injuring Syngenta and improperly providing FBN a competitive advantage at Syngenta's expense.

129.    Sleper intended to harm Syngenta by interfering with Warner's contractual obligations to Syngenta. He intentionally procured the breach of those contractual obligations in sharing Syngenta Confidential Information with FBN and using it for FBN's benefit, in direct contravention of the non-competition and non-disclosure obligations in Sleper's Agreements.

130.    Sleper's interference was and is improper and without justification or privilege. Sleper interfered with Warner's contractual obligations, with the intent of injuring Syngenta and improperly providing FBN a competitive advantage at Syngenta's expense.

131.    As a direct and proximate result of the Defendants' interference with contract, Syngenta has been damaged in an amount to be determined at trial. In addition, Syngenta has suffered irreparable harm and will continue to suffer irreparable harm unless FBN's conduct is enjoined by this Court.

## COUNT V: VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200 *et seq.*)
### (Against FBN)

132.    Syngenta realleges and incorporates by reference herein the foregoing allegations of the Complaint.

133.    California's Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

134.    Defendants' conduct as alleged herein constitutes unlawful and/or unfair business acts or practices, including without limitation Defendants' tortious interference with Syngenta's valid contractual relationships and misappropriation of confidential information.

135.    Defendants' unlawful and/or unfair actions, as alleged above, have caused and continue to cause economic injury to Syngenta.

136.    Pursuant to California Business & Professions Code § 17203, Defendants are required to disgorge and restore to Syngenta as restitution all profits misappropriated by means of Defendants' unlawful and unfair competition with Syngenta.

## COUNT VI: CIVIL CONSPIRACY
## (ALL DEFENDANTS)

137.    Syngenta realleges and incorporates by reference herein the foregoing allegations of the Complaint.

138.    A civil conspiracy requires an agreement between two or more persons to commit a wrongful act; an act in furtherance of the agreement; and damage to the plaintiff as a result.

139.    Defendants have agreed to unlawfully harm Syngenta in its ability to

compete with FBN by misappropriating Syngenta's trade secrets and Confidential Information and interfering with Syngenta's employment contracts. Defendants' actions undertaken in furtherance of the agreement include, but are not limited to, the FBN's soliciting Syngenta Confidential Information from Warner and Sleper while they were still Syngenta employees in violation of their agreements with Syngenta and FBN's use of the information to compete with Syngenta. As a direct and proximate result of these actions, Syngenta has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, based on Defendants' conduct complained of, herein, Plaintiff asks this Court for:

1. An Order preliminarily enjoining, restraining, and requiring Defendants and anyone acting in active concert or participation with them to:

   a. Permit an inspection of any and all electronic devices to which Warner and Sleper had access, including all cell phones, computers, tablets, external storage devices, or other electronic devices capable of storing data;

   b. Permit an inspection of Warner's and Sleper's personal email accounts to determine the scope and nature of their use, access,

storage, or dissemination of Syngenta's trade secrets and/or
confidential information; and

   c. Disclose the identity of any and all individuals or entities to whom
Warner and/or Sleper provided any of Syngenta's trade secrets
and/or confidential information;

2.    An Order permanently enjoining, restraining, and requiring Defendants
and anyone acting in active concert or participation with them to:

   a. Deliver to Syngenta all materials embodying, deriving from, or
otherwise revealing Syngenta's trade secrets and/or confidential
information; and

   b. Certify that they do not currently have access to, or possession,
custody, or control of any of Syngenta's trade secrets and/or
confidential information;

3.    An Award to Syngenta of its compensatory damages equal to
Syngenta's economic loss or Defendants' unjust enrichment, whichever
is greater;

4.    An Award of punitive damages pursuant to North Carolina General
Statutes, § 66-154(c);

5.    An Award of Syngenta's costs and attorneys' fees and expenses
incurred herein;

6.      An Award to Syngenta of such other, further, or different relief as the

Court deems just and proper.

Dated: December 19, 2020

FAEGRE DRINKER BIDDLE & REATH LLP

_s/Kerry L. Bundy_

Kerry L. Bundy
Bar Number 266917
Michael M. Sawers
Bar Number 392437
Bryan K. Washburn
Bar Number 0397733
Attorneys for Plaintiff Syngenta Seeds, LLC

FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Fax: (612) 766 1600
kerry.bundy@faegredrinker.com
michael.sawers@faegredrinker.com
bryan.washburn@faegredrinker.com