# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Syngenta Seeds, LLC,

File No. 20-cv-1428 (ECT/BRT)

        Plaintiff,

v.

**OPINION AND ORDER**

Todd Warner, Joshua Sleper, and Farmer's
Business Network,

        Defendants.

---

Kerry L. Bundy, Bryan K. Washburn, Michael M. Sawers, and Matthew B. Kilby, Faegre
Drinker Biddle & Reath LLP, Minneapolis, MN; Matthew Burkhart, Faegre Drinker Biddle
& Reath LLP, Indianapolis, IN, for Plaintiff Syngenta Seeds, LLC.

Daniel J. Supalla and Joel D. O'Malley, Nilan Johnson Lewis P.A., Minneapolis, MN, for
Defendant Todd Warner.

Bruce H. Little, Autumn Gear, and Timothy Y. Wong, Barnes & Thornburg LLP,
Minneapolis, MN, for Defendant Joshua Sleper.

Claude M. Stern and Kaitlin E. Keohane, Quinn Emanuel Urquhart & Sullivan LLP,
Redwood Shores, CA; Ryan Landes, Quinn Emanuel Urquhart & Sullivan LLP, Los
Angeles, CA; Caitlin Gehlen, Dean A. LeDoux, and Loren L. Hansen, Lathrop GPM LLP,
Minneapolis, MN, for Defendant Farmer's Business Network.

---

        Syngenta Seeds, LLC believes that two of its former employees—Todd Warner and

Joshua Sleper—took its confidential business information and trade secrets and used them

to help a competitor called Farmer's Business Network ("FBN"). Syngenta originally filed

this lawsuit against Warner only, but after some expedited discovery, it amended its

complaint to add Sleper and FBN as Defendants. It now claims that Warner and Sleper

breached their contractual obligations; that FBN violated the California Unfair

Competition Law, Cal. Bus. & Prof. Code § 17200; and that all three Defendants misappropriated its trade secrets, tortiously interfered with its contractual relations, and engaged in a civil conspiracy to harm it. *See* Second Am. Compl. ¶¶ 90–139 [ECF No. 69]. Warner filed an answer to the Amended Complaint, but Defendants Sleper and FBN moved to dismiss the counts against them for failure to state a claim. ECF No. 61; *see* Fed. R. Civ. P. 12(b)(6).

Defendants' motion will be granted in part and denied in part. Syngenta has plausibly alleged that Sleper breached his employment contract and that Sleper and FBN misappropriated its trade secrets and engaged in a civil conspiracy. The motion will therefore be denied with respect to those claims. Syngenta has not plausibly alleged that FBN and Sleper tortiously interfered with its contractual relations, and its claim under the California Unfair Competition Law is preempted. Those claims will be dismissed without prejudice to give Syngenta an opportunity to amend its complaint.

I[1]

A

Syngenta is an "agtech company" that develops and produces seeds and "crop protection innovations, including hybrid varieties and biotech crops." Second Am. Compl. ¶ 9. The goal of its business is to produce new varieties of seeds that maximize desirable genetic characteristics and minimize undesirable ones. *Id.* ¶¶ 19–20, 27. To do this, it

---

[1]    In accordance with the standards governing a motion under Rule 12(b)(6), and unless otherwise noted, the facts are drawn entirely from Plaintiff's Second Amended Complaint. *See Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

interbreeds "parent plants" and evaluates the resulting progeny, sometimes over "several years and across a wide range of environments." *Id.* ¶¶ 20, 22. It then selects the best progeny for release on the market, "for use in hybrid seed production," or for use "as a parental line in further breeding efforts." *Id.* ¶ 22. After expending "a considerable amount of time and effort and large sums of money," Syngenta has developed "a diverse and valuable germplasm pool and commercially valuable seeds." *Id.* ¶ 26.

Syngenta maintains a great deal of valuable information related to this process. *Id.* ¶ 24. Most notably, this includes "genetic data" for the "millions of different varieties" of seeds in its catalogue, as well as

> pedigree information; genetic maps; stage in pipeline; performance (yield) data; general combining ability of early-stage lines; molecular marker (genotyping) data; data generated from pan-genomic analytics using DNA sequence data; trial data; results of analytics; characterization of Syngenta's proprietary Family Based Association Mapping; genetic modifications of seeds; integration of genetic modifications into Syngenta's germplasm; seed breeding processes and procedures; seed testing data; strategic plans for future lines of seeds; and the performance of current and future products.

*Id.* ¶¶ 23–24. Syngenta also uses "proprietary methods" to "materially accelerate[] its breeding process beyond industry standards"; "internal modeling techniques and cost-optimization strategies"; and "internal financial information" that describes how best to allocate research-and-development resources. *Id.* ¶¶ 30–31.

3

Syngenta takes a number of measures to ensure that its information is "maintained in confidence."[2] *Id.* ¶ 21. For example, it limits visitor access in its buildings and requires key cards for entry. *Id.* ¶ 77. It stores its data on "secure servers" and limited-access "cloud-based storage systems." *Id.* ¶¶ 77–78. As discussed in more detail below, Syngenta requires its employees to sign nondisclosure agreements, but it also documents its confidentiality policies in writing elsewhere, including an "Employee Handbook," a "Security Code of Practice," and a "Code of Conduct." *Id.* ¶¶ 77, 80–82. Employees undergo an annual training on the company's confidentiality policies, must acknowledge their understanding of these policies each time they access Syngenta's network and computers, and must "formally re-acknowledge their confidentiality obligations" upon departure from the company. *Id.* ¶¶ 77, 83–84.

## B

This dispute involves the alleged conduct of two former Syngenta employees: Todd Warner and Joshua Sleper. Warner, a Minnesota resident, was a "leader in Syngenta's research and development division," serving most recently as the "Head of Field Analytics" and one of four members of a "Quantitative Breeding Leadership Team." *Id.* ¶¶ 10–11, 42. In those roles, he "managed dozens of ongoing Syngenta genetic projects, including experimental breeding, seed testing, data, analysis, trialing, and results." *Id.* ¶ 41. Unsurprisingly, he had access both to a significant amount of confidential data and to the company's "long-term strategic plan." *Id.* ¶¶ 39–40, 42–43.

---

[2] Syngenta patents—*i.e.*, publicly discloses—"some of its seed technology," but not its "hybrids or . . . information about how they are developed." *Id.* ¶ 87.

4

Sleper, also a Minnesota resident, was a research and development scientist on Syngenta's "Genomic Prediction Team," which involved "delivering novel validated genomic prediction methods and tools for analysis." *Id.* ¶ 12. This gave him "unlimited access" to "data on germplasm and traits." *Id.* ¶ 44. Although he worked out of Minnesota, he "would at times travel" to Syngenta's "primary seeds research facility" in North Carolina. *Id.* ¶ 25.

Both men signed "identical" Employment Agreements with Syngenta. *Id.* ¶¶ 32–33. Those agreements contain three provisions that are relevant to this case. The first was a non-compete provision, which generally prohibited employees from "engag[ing]," "directly or indirectly, as principal, agent, [or] consultant," in the same type of "Business" as Syngenta during their employment and for one year thereafter. Landes Aff., Exs. A, B ¶¶ 5(c), 11, 13 ("Employment Agreement") [ECF Nos. 66-1, 66-2]; *see* Second Am. Compl. ¶ 35 n.2.[3]

The second was a nondisclosure provision, which required employees to "keep and maintain" a defined subset of "Confidential Information in strictest confidence" and, except as required for their assigned work, to refrain from "us[ing]," "publish[ing]," or "disclos[ing]" "any information, knowledge or data relating to the Company" or "owned by, controlled by or in the possession of the Company." Employment Agreement ¶ 6(a);

---

[3]     Defendants attached the full Employment Agreements to a request for judicial notice. ECF Nos. 64–66. It is appropriate to consider the Agreements without converting Defendants' motion into one for summary judgment because the Agreements are "contemplated by [and] expressly mentioned in the complaint." *Dittmer Props., L.P. v. F.D.I.C.*, 708 F.3d 1011, 1021 (8th Cir. 2013).

Second Am. Compl. ¶ 36. "Confidential Information" was defined elsewhere to include a long list of items ranging from "product or service information" to "trade secrets" to "fees, costs and pricing structures" and "all similar and related information in whatever form." Second Am. Compl. ¶ 33 n.1.

The third was a provision requiring employees to return certain company property upon the termination of employment. Employment Agreement ¶ 14(a); Second Am. Compl. ¶ 37. This requirement applied to all "documents, whether or not obtained from [Syngenta], which pertain to [Syngenta], contain Confidential Information or were received or used by [the e]mployee in connection with [his] employment[.]" *Id.*

## C

In early 2019, Warner and Sleper began planning to leave Syngenta to join a competitor called Farmer's Business Network, a Delaware corporation headquartered in California. Second Am. Compl. ¶¶ 13, 45. By May of that year, Warner was in touch with Ron Wulfkuhle, a former Syngenta employee who had become the head of FBN's Seed R&D Department. *Id.* ¶ 46. Warner wrote to Wulfkuhle that he was "interest[ed] in the opportunity to setup a cutting edge molecular breeding and modeling team," that he and Sleper had worked together to create the systems currently in place at Syngenta, and that they needed to "get things moving as fast as possible to develop new germplasm to support FBN farmers." *Id.* ¶ 47.

These initial contacts led to a meeting between Warner, Sleper, and Wulfkuhle at a restaurant in Albert Lea, Minnesota, in June 2019, while both Warner and Sleper were still employed at Syngenta. Ahead of the meeting, Warner wrote that he and Sleper could

"share the vision about how we can jump start early stage breeding at FBN." *Id.* ¶ 49. After the meeting, which lasted "a couple of hours," Wulfkuhle wrote to another FBN employee that Warner and Sleper had "great ideas about how to bring genomics and phenomics concepts to life . . . to outperform the multinationals." *Id.* ¶ 50. According to Syngenta, these communications indicate that Warner and Sleper "provided FBN with Syngenta Confidential Information" at the meeting. *Id.*

In the hours and days after the Albert Lea meeting, Sleper "accessed" two types of information, apparently from the Syngenta network: (1) "information related to breeding values and genotyping" and (2) "early-stage breeding information." *Id.* ¶¶ 52–53. Both are relevant for starting a seed breeding program. *See id.* A few days later, Warner and Sleper sent Wulfkuhle an email with the subject line, "Seed R&D Plans," in which they "disclosed Syngenta confidential cost structures" that would allegedly help FBN create a seed breeding program. *Id.* ¶ 54. Specifically, they attached a PDF entitled "BreedingPlanCosts," which allegedly "included detailed Syngenta Confidential Information about developing germplasm and accelerating genetic gain beyond industry standards." *Id.* ¶ 55. The PDF appears to describe, in general terms, strategies and cost allocations for a hypothetical breeding program. *See* Sawers Decl., Ex. A [ECF No. 72].[4] The "concepts" in the document were allegedly a "copycat of the early-stage breeding" information that Sleper accessed a few days earlier. *Id.* ¶ 56.

---

[4]     The PDF, which Syngenta submitted as an exhibit when it filed its response brief, is also appropriate to consider because it is "contemplated by [and] expressly mentioned in the complaint." *Dittmer Props., L.P.*, 708 F.3d at 1021.

Over the next several months, Warner and Sleper continued to work for Syngenta but kept in touch with FBN. In text messages between the two men in October 2019, Sleper wrote that "no one gets how much we know"; asked Warner about the expiration date for a particular patent; and suggested that they "find some more data." *Id.* ¶¶ 57–59. In late 2019 and early 2020, Warner officially interviewed for a position with FBN. *Id.* ¶ 61. Shortly thereafter, FBN employees presented a "breeding plan" to the company's chief executive officer and chief financial officer that Syngenta believes contained confidential Syngenta information that Warner and Sleper had provided. *Id.* ¶ 62.

As contacts with FBN continued, both Warner and Sleper allegedly copied some Syngenta information to external storage devices. Most relevant to this motion, in April 2020, Sleper inserted USB storage devices into his Syngenta-issued laptop and then "navigated between his local hard drive and the external USB storage devices," which is "behavior consistent with copying data." *Id.* ¶ 70. Syngenta alleges that Sleper and Warner copied and took at least the following information:

    a. Collection of trade secret information about Syngenta corn and soy germplasm. . . .

    b. Datasets about Syngenta's North America breeding program for corn and soy.

    c. Syngenta germplasm information, including information about seed pedigree, genetic maps, the pipeline state of the seeds, performance (yield) data, general combining ability of early-stage lines, molecular marker (genotyping) data, and additional genotyping data generated from pan-genomic analytics using DNA sequence data.

     d.  Corn drought program for Syngenta Artesian product pipeline, including trial data, results of the analytics, and important germplasm information such as pedigree information.

     e.  Syngenta trial information from 2011-13, including locations, planting dates, and annotation of the trials using an internal environmental classification system which enables GxE analytics (genetics by environment) that assess the performance of germplasm in different environmental conditions.

*Id.* ¶ 76.

On April 24, Sleper announced his resignation from Syngenta, effective May 1, and he eventually joined FBN. *Id.* ¶¶ 12, 72. In May, FBN offered Warner a job and he resigned from Syngenta. *Id.* ¶¶ 73–74. Syngenta does not allege that Warner is currently an employee at FBN.

## D

Syngenta originally brought this action in June 2020 against Warner for breach of contract and misappropriation of trade secrets under federal and state law. Compl. ¶¶ 71–96 [ECF No. 1]. By stipulation, the Parties agreed that Syngenta could conduct expedited third-party discovery of FBN and its employees. ECF Nos. 6–9. That discovery led Syngenta to amend its complaint to add claims against Sleper and FBN. *See* Am. Compl. ¶¶ 90–139 [ECF Nos. 38–39]. Syngenta now includes claims for breach of contract; violations of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-153; violations of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b); tortious interference with a contract; violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200; and civil conspiracy. Warner filed an answer to the Amended

Complaint, ECF No. 53, but FBN and Sleper filed the present joint motion to dismiss it for failure to state a claim. ECF No. 61. Shortly before filing a response to the motion, Syngenta filed a Second Amended Complaint that asserts the same claims as the First Amended Complaint. ECF No. 69.

## II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III

Before addressing the merits of Defendants' motion, there is a preliminary issue: whether Syngenta's Second Amended Complaint moots Defendants' motion to dismiss the First Amended Complaint. The filing of an amended complaint "[o]rdinarily" renders a Rule 12(b)(6) motion moot because the amendments usually "address deficiencies identified in the motion" and "add allegations not addressed by the motion." *Crandall v. Miller & Stevens, P.A.*, No. 20-cv-1793 (ECT/LIB), 2020 WL 6158214, at *2 (D. Minn.

Oct. 21, 2020). Sometimes, however, it is appropriate to construe the pending motion as a motion to dismiss the amended complaint, particularly where the Parties' agree to that approach. *See Manos v. Fed. Bureau of Prisons*, No. 18-cv-427 (PJS/HB), 2019 WL 1494604, at *2 (D. Minn. Mar. 11, 2019), *report and recommendation adopted*, 2019 WL 1491789 (D. Minn. Apr. 4, 2019); *Onyiah v. St. Cloud State Univ.*, 655 F. Supp. 2d 948, 958 (D. Minn. 2009).

Defendants' motion is not moot. The changes between the First and Second Amended Complaints are limited. Defendants had a chance to address those changes in their reply brief, and they request a merits decision on their motion "[i]n the interest of judicial economy." Defs.' Reply Mem. at 1 [ECF No. 83]. Plaintiffs do not object to this proposal. For the sake of efficiency, and because there is no reason to believe that additional briefing would be helpful to the Parties, Defendants' motion will be treated as a motion to dismiss the Second Amended Complaint.

IV

First things first, there is a choice-of-law question with implications for several of Syngenta's claims. Relevant to this motion, Sleper's Employment Agreement contained the following choice-of-law provision: "This Agreement shall be subject to and governed by the substantive laws of the State of North Carolina, without giving effect to the conflicts of laws provisions thereof." Employment Agreement § 15(c). According to Syngenta, this provision requires the application of North Carolina law both to its breach-of-contract claim and to most of its statutory and common-law tort claims. *See* Pl.'s Mem. at 17–22, 35–36. Defendants argue that Syngenta waived application of this provision by filing suit

11

in Minnesota; that applying North Carolina law would be unconstitutional; and that, even if North Carolina law applies to the breach-of-contract claim, it does not apply to Syngenta's other claims. Defs.' Mem. at 12–17 [ECF No. 63].

This question matters because of a relevant conflict between Minnesota and North Carolina law. *See Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1393 (8th Cir. 1997) (explaining that the first step of a choice-of-law analysis is to determine "whether a conflict actually exists between the different states"). If Minnesota law applies, then Syngenta's state statutory claim for misappropriation of trade secrets will be governed by the Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. §§ 325C.02–.03. That statute contains a provision that "displace[s] conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." *Id.* § 325C.07(a). Courts have interpreted this provision to preempt all "claim[s] that assert[] nothing more than misappropriation or misuse of a trade secret." *Schlief v. Nu-Source, Inc.*, No. 10-cv-4477 (DWF/SER), 2011 WL 1560672, at *6 (D. Minn. Apr. 25, 2011) (citing *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1179–80 (D. Minn. 2003)). This would prevent Syngenta from pursuing some of its non-contractual claims unless it can show that those claims sweep more broadly than the alleged misappropriation of trade secrets. *See* Defs.' Mem. at 20–22, 27 n.7 (arguing that Syngenta's claims are preempted). By contrast, if North Carolina law applies, then Syngenta's state statutory trade-secret claims will be governed by the North Carolina Trade Secrets Protection Act ("NCTSPA"), N.C. Gen. Stat. § 66-153. That statute, unlike the

MUTSA, does not contain a preemption provision, so if it applies, most of Defendants' preemption arguments would fall away.

When faced with a choice-of-law question, "[a] federal court sitting in diversity ordinarily must follow the choice-of-law rules of the [s]tate in which it sits." *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 65 (2013). Under Minnesota law, courts generally enforce contractual choice-of-law provisions, subject to two limitations. *See St. Jude Med. S.C., Inc. v. Suchomel*, No. 19-cv-2400 (JRT/BRT), 2020 WL 1853653, at *5 (D. Minn. Apr. 13, 2020). First, as a matter of Minnesota law, the parties must have "acted in good faith and without an intent to evade the law." *St. Jude Med. S.C., Inc. v. Biosense Webster, Inc.*, 818 F.3d 785, 788 (8th Cir. 2016) (citation and alterations omitted). Defendants do not argue that there was any bad faith or intent to evade the law here. Second, as a matter of federal constitutional law, the state chosen must have a "significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 313 (1981). Moreover, a contractual choice-of-law provision may govern more than just contractual claims, extending to those non-contractual claims that are "closely related to the interpretation of the contract[]." *Nw. Airlines, Inc.*, 111 F.3d at 1392.

## A

Start with Defendants' waiver argument. To support this argument, Defendants point to the following forum selection clause, which comes immediately after the choice-of-law clause in Sleper's Employment Agreement: "The parties hereby submit to the

exclusive jurisdiction and venue of the state and federal courts of North Carolina and Company and Employee agree that each are required to enforce, and seek interpretation or declaration of, their rights hereunder exclusively in such courts." Employment Agreement § 15(c). In Defendants' view, Syngenta "waived application of the choice-of-law provision" by filing suit in Minnesota instead of North Carolina. Defs.' Mem. at 15; Defs.' Reply Mem. at 6 (citing *Stericycle, Inc. v. Carney*, No. 12 C 9130, 2013 WL 3671288 (N.D. Ill. July 12, 2013)).

Courts have generally rejected similar waiver arguments on the ground that they conflate choice of law with a plaintiff's choice of forum. *See Merrill Lynch Cap. Servs., Inc. v. Apache Structures LLC*, No. CV 09-6166 DMG (RZx), 2010 WL 11549358, at *3 (C.D. Cal. May 10, 2010) (finding "no reason to infer a waiver of one clause from the waiver of an entirely distinct and only tangentially related clause"); *Ackerley Media Grp., Inc. v. Sharp Elec. Corp.*, 170 F. Supp. 2d 445, 451 (S.D.N.Y. 2001) (similar); *see also Great Am. Opportunities, Inc. v. Kent*, 352 F. Supp. 3d 1126, 1132 (D. Colo. 2018). This is not surprising; "[a] choice-of-law clause and a forum selection clause are not the same, and address different needs and concerns." *Robbins & Meyers, Inc. v. J.M. Huber Corp.*, No. 01-CV-201E(F), 2001 WL 967606, at *3 (W.D.N.Y. Aug. 23, 2001) (citation omitted); *see also Allegra Holdings, LLC v. Davis*, No. 13-CV-13498, 2014 WL 1652221, at *4 (E.D. Mich. Apr. 24, 2014) ("A choice of forum is *not* tantamount to a choice of law."). Defendants identify no persuasive reason to reach a different result here. The appropriateness of Minnesota as a forum is not at issue on this motion, and in any event, the choice of forum does not dictate which law applies.

*Stericycle*, the case on which Defendants rely, does not support their argument. The contract at issue in that case, like this case, contained both a choice-of-law clause and a forum-selection clause. *Id.* at *4 n.6. In a footnote, the court concluded that the plaintiff had waived any objection to *venue* by filing suit in a state other than that mandated by the forum-selection clause. *Id.* And, as Defendants point out, the court applied the law of the forum state rather than the state specified in the choice-of-law clause. *Id.* But the court based its choice of law on the fact that neither party had identified a relevant conflict of law. *Id.* In other words, the court did not say that its venue and choice-of-law rulings were related to one another or that a waiver with respect to one clause constituted a waiver with respect to the other. The bottom line is that Syngenta has not waived application of North Carolina law.

## B

Defendants next argue that applying North Carolina law in this case would be unconstitutional because of the lack of connection between the Parties and that state. They point out that Syngenta is a Delaware corporation headquartered in Illinois; that both Warner and Sleper lived and worked in Minnesota; and that FBN is a Delaware corporation headquartered in California. Defs.' Mem. at 12–13.

A choice-of-law provision is generally constitutionally permissible if at least one party to the contract has "significant contact or [a] significant aggregation of contacts" with the chosen state. *Allstate Ins. Co.*, 449 U.S. at 313; *see Suchomel*, 2020 WL 1853653, at *5 (concluding that a choice-of-law provision was "clearly constitutional" based only on the plaintiff's contacts with Minnesota); *St. Jude Med., S.C. v. Biosense Webster, Inc.*, 994

F. Supp. 2d 1033, 1041 (D. Minn. 2014) (similar). And a party's agreement in advance to apply the law of a particular state can itself be considered a contact with that state. *See Brand Advantage Grp., Inc. v. Henshaw*, No. 20-cv-225 (JRT/HB), 2020 WL 1891772, at *5 (D. Minn. Apr. 16, 2020).

Syngenta's allegations make it at least plausible that the choice-of-law provision in Sleper's contract is constitutionally permissible. First, Syngenta alleges that its "primary seeds research facility" is located in North Carolina and that the "primary leaders" of its research and development team either live in North Carolina or travel there regularly. Second Am. Compl. ¶ 25. Sleper lived and worked in Minnesota, but he "engaged daily" with other Syngenta employees located in North Carolina, and he traveled to the North Carolina research facility for work on multiple occasions, "as recently as January 2020." *Id.* Second, the fact that Sleper agreed in advance to the application of North Carolina law detracts from any arbitrariness argument. *See Henshaw*, 2020 WL 1891772, at *5; *cf. Allstate Ins. Co.*, 449 U.S. at 318 n.24 (explaining that there was "no element of unfair surprise or frustration of legitimate expectations" involved in applying a particular state's law because the relevant party "had to have anticipated" it).

Defendants rely on *Menzies Aviation (USA), Inc. v. Wilcox*, 978 F. Supp. 2d 983 (D. Minn. 2013), but it is distinguishable. In denying a motion for a temporary restraining order, the court in that case concluded that applying a Florida choice-of-law provision was likely unconstitutional because "the record demonstrate[d] no connection to Florida" and the party seeking to apply it "ma[de] no argument that Florida ha[d] any connection to the parties or case before the [c]ourt." *Id.* at 997. Aside from the fact that different standards

16

apply to a Rule 12(b)(6) motion and a motion for a temporary restraining order, the record in this case is not devoid of contacts with North Carolina.  To be sure, North Carolina law does not seem like the most natural choice to govern a contract between the Parties to this case, but that is a far cry from concluding that it is a fundamentally unfair one.

## C

Defendants do not really dispute that, if the choice-of-law provision applies at all, then it governs Syngenta's breach-of-contract claims.  They argue, however, that it cannot extend to Syngenta's state statutory trade-secret claims or its tortious-interference claims. *See* Defs.' Reply Mem. at 6.  This question has consequences for the analytical framework: once a court concludes that a choice-of-law provision governs a claim, it need not apply Minnesota's normal multi-factor choice-of-law test to determine what law governs that claim.  *See, e.g.*, *Airtel Wireless, LLC v. Montana Elec. Co.*, 393 F. Supp. 2d 777, 784 (D. Minn. 2005).

"In some circumstances, choice of law clauses can control which jurisdiction's law will govern statutory or tort claims in addition to breach of contract claims arising out of the agreements of which the clauses are a part." *Khoday v. Symantec Corp.*, No. 11-cv-180 (JRT/TNL), 2014 WL 1281600, at *18 (D. Minn. Mar. 13, 2014) (alteration omitted) (quoting *Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1031–32 (D. Minn. 2013)).  Whether a choice-of-law clause governs a non-contractual claim is a context-specific question that depends on both the language of the clause and the nature of the claim asserted.  For example, the Eighth Circuit has held that a clause providing that an agreement would "be governed by and interpreted in accordance with" Minnesota law

17

applied to a plaintiff's claims for negligent performance, misrepresentation, deceptive trade practices, and unjust enrichment. *Nw. Airlines, Inc.*, 111 F.3d at 1392; *see also Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1061 (8th Cir. 2003); *Nat'l Agri-Services, Inc. v. AGCO Corp.*, No. 04-cv-4530 (JMR/FLN), 2006 WL 8445121, at *2–3 (D. Minn. Feb. 15, 2006). When a choice-of-law provision contains narrower language—for example, saying that the chosen law governs only the "interpretation" of the contract—it may not extend to non-contractual claims. *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 930 (8th Cir. 1999) (applying Arkansas law). If the language is broad enough to implicate non-contractual claims, then the chosen law will apply to those claims if they are "'closely related' to the terms of the contract, such that the [c]ourt would need to interpret the contract in order to resolve the . . . claim.'" *Warren E. Johnson Cos. v. Unified Brand, Inc.*, 735 F. Supp. 2d 1099, 1105 (D. Minn. 2010) (adopting report and recommendation); *cf. Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687–88 (8th Cir. 2001) (concluding that a choice-of-law provision did not apply to a fraudulent-concealment claim that "arose out of the circumstances surrounding the formation of the contract").

First, the North Carolina choice-of-law provision applies to Syngenta's state statutory trade-secret claim. Like the clause at issue in *Northwest Airlines*, the provision here says that Sleper's Employment Agreement would be "governed by" North Carolina law, not just that North Carolina law would "govern its interpretation." *Compare Nw. Airlines, Inc.*, 111 F.3d at 1392, *with Heating & Air Specialists, Inc.*, 180 F.3d at 930. It is therefore broad enough to encompass at least some non-contractual claims. And determining whether Sleper misappropriated Syngenta's trade secrets will likely require

"interpret[ing] the scope of the [Agreement's] confidentiality provision[s]." *Superior Edge, Inc.*, 964 F. Supp. 2d at 1032 (applying a choice-of-law provision to a statutory trade-secret claim); *cf. Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 866–67 (D. Minn. 2015) (similar, but addressing a motion for a preliminary injunction). That's because a misappropriation claim requires a plaintiff to show that the defendant acquired, disclosed, or used a trade secret "without express or implied authority or consent." N.C. Gen. Stat. § 66-152(1); *accord* Minn. Stat. § 325C.01, subd. 3; *see also Katch, LLC*, 143 F. Supp. 3d at 867 n.11. The North Carolina Trade Secret Protection Act will therefore be applied to Syngenta's state statutory trade-secret claim.

For the same reasons, North Carolina law will be applied to Syngenta's civil-conspiracy claim. As discussed below, the alleged misappropriation of Syngenta's trade secrets is the only plausible tort on which Syngenta could base its conspiracy claim. And because North Carolina law applies to the trade-secret claim, it would make little sense to apply any other state's law to the civil-conspiracy claim, which is a derivative theory of liability rather than a freestanding cause of action. *See Dove v. Harvey*, 608 S.E.2d 798, 800 (N.C. Ct. App. 2005); *accord Prairie Field Servs., LLC v. Welsh*, __ F. Supp. 3d __, No. 20-cv-2160 (ECT/KMM), 2020 WL 6336705, at *13 (D. Minn. Oct. 29, 2020).

It seems even clearer that the choice-of-law provision covers Syngenta's claims for tortious interference with a contract. Evaluating those claims will require determining, among other things, whether Warner and Sleper breached their Employment Agreements. *See Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 784 S.E.2d 457, 462 (N.C. 2016); *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998). It

19

almost goes without saying, then, that the claims are "closely related to the interpretation of the contracts." *Nw. Airlines*, 111 F.3d at 1392.

V

With the choice-of-law questions out of the way, next is the breach-of-contract claim against Sleper. In their opening brief, Defendants raised two arguments: (1) that Syngenta Seeds *LLC* does not have standing to make this claim because the Employment Agreement lists Syngenta Seeds, *Inc.* as a party; and (2) that Syngenta has not adequately alleged that Sleper breached the Agreement. Defs.' Mem. at 9–12. The Second Amended Complaint took care of the first argument by adding allegations that Syngenta converted from a Delaware corporation to an LLC in 2015 and that the two entities are "deemed to be the same." Pl.'s Mem. at 12 (quoting 8 Del. Code § 266(h)); *see* Second Am. Compl. ¶ 8. Defendants acknowledge this and abandon the standing argument in their reply brief. *See* Defs.' Reply Mem. at 2. That leaves only the second argument. To survive a motion to dismiss, Syngenta must plausibly allege, among other things, "the facts constituting the breach." *Frye v. Brunswick Cnty. Bd. of Educ.*, 612 F. Supp. 2d 694, 708 (E.D.N.C. 2009).

Syngenta claims that Sleper breached three provisions of his Employment Agreement: the confidentiality provision, the noncompete provision, and the provision requiring him to return company property upon his resignation. Pl.'s Mem. at 13–16. Defendants argue that Syngenta's allegations are conclusory and show, at most, that Sleper accessed confidential information while employed at Syngenta and discussed future plans during a job-interview process with FBN. *See* Defs.' Reply Mem. at 2–5.

20

A

First, in light of the Employment Agreement's broad language, it is plausible that Sleper breached the confidentiality provision.  Recall that this provision prohibited Sleper from "us[ing] for [himself] or for others . . . or disclos[ing] to any third party any information, knowledge or data relating to" Syngenta or "any other information, knowledge or data owned by, controlled by or in the possession of" Syngenta. Employment Agreement § 6(a).  There is no doubt that Sleper had access to information that fell into these broad categories and that FBN plausibly knew he did.  Warner made clear in his initial contacts with FBN that he and Sleper worked "as a team" to develop Syngenta's "trial design, trial analysis, and molecular breeding systems" and that they could "share the vision" for how to "jump start early stage breeding at FBN."  Second Am. Compl. ¶¶ 47, 49.  Sleper then attended at least one face-to-face meeting with an FBN representative, where he shared "great ideas" about "genomics and phenomics concepts." *Id.* ¶ 50.  Immediately after the meeting, Sleper accessed "information related to breeding values and genotyping" and information "regarding early-stage breeding practices at Syngenta," both of which included information that Syngenta "deemed confidential." Second Am. Compl. ¶¶ 52–53.  He then used that information to create the BreedingPlanCosts PDF, which he emailed to FBN just a few days later.  *Id.* ¶¶ 54–56. Whether or not these allegations show that Sleper directly disclosed any particular piece of Syngenta information to FBN, it is at least plausible that he "indirectly" disclosed company information or that he "use[d]" such information "for [himself] or for [FBN]."  That is enough under the language of the contract.  Employment Agreement § 6(a).

B

It is also plausible that Sleper breached the provision requiring him to return all "documents . . . which pertain to the Company, contain Confidential Information, or were received or used by [him] in connection with [his] employment." Employment Agreement § 14(a). Syngenta alleges that, on multiple occasions, Sleper "inserted external USB storage devices into his Syngenta-issued laptop," "accessed Syngenta information," and "navigated between his local hard drive and the external USB storage devices," which is "behavior consistent with copying data." Second Am. Compl. ¶ 69. Despite this, he did not "leave any USB devices in his office" or otherwise return them to the company when he departed. *Id.*; *see id.* ¶ 92. Syngenta does not identify exactly what Sleper copied to those external storage devices, but elsewhere it details more specific "examples of the information taken" when both Warner and Sleper "downloaded Syngenta Confidential Information." *Id.* ¶ 76. Considered together, these allegations make it plausible that Sleper breached his duty to return Syngenta's information.[5]

---

[5] After the Parties completed their briefing on Defendants' motion, Syngenta requested and received leave to file a sur-reply. *See* ECF Nos. 88, 90. According to the sur-reply and supporting documents, Sleper recently deleted from his personal device "material that he retained from his time as a Syngenta employee"—specifically, "four (4) Excel spreadsheets [he] received from a colleague that contained Plant Variety Protection ('PVP') information for breading lines." Pl.'s Sur-reply Mem. at 2–3 [ECF No. 94]; *see* Sawers Decl., Exs. 1–2 [ECF Nos. 98, 98-1]. The destruction allegedly occurred in October, but Defendants did not disclose it to Syngenta until December 30, after Syngenta had filed its Second Amended Complaint and its response brief. Sawers Decl., Ex. 2 at 2. Syngenta argues that this conduct is an "additional reason[]" to deny Defendants' motion to dismiss with respect to its breach-of-contract claims. Pl.'s Sur-reply Mem. at 4. Because these allegations are not in the Second Amended Complaint, they have no bearing on the resolution of this motion. As discussed below, however, they do bear on the question of whether Syngenta should have another opportunity to amend its complaint.

C

Whether Syngenta has plausibly alleged a breach of Sleper's covenant not to compete is a closer call. According to Syngenta, Sleper was effectively working for FBN by "help[ing] jumpstart its R&D Department" while Syngenta still employed him. Pl.'s Mem. at 16. Sleper argues that, at most, he was "interviewing and describing the contours of the position, his plans, and qualifications," not actively competing with Syngenta. Defs.' Reply Mem. at 4.

Relevant here, the noncompete provision required Sleper to refrain from "engag[ing] in the 'Business'," "directly or indirectly, as principal, agent, [or] consultant[.]" Employment Agreement § 5(c).[6] The "Business" is, essentially, "the research [and] development . . . of chemical, seed and agricultural input products and services." Employment Agreement § 13. The Agreement does not define what it means to "engage" as a "principal, agent, [or] consultant." Under North Carolina law, "any undefined, nontechnical word" in a contract "is 'given a meaning consistent with the sense in which [it is] used in ordinary speech, unless the context clearly requires otherwise.'" *State v. Philip Morris USA Inc.*, 685 S.E.2d 85, 91 (N.C. 2009) (quoting *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970)). To "engage"

---

[6]     Although the noncompete provision, on its face, applies both during the period of employment "and for a period of one year after termination of [Sleper's] employment for any reason," Employment Agreement §§ 5(c), 11, Syngenta has not argued that Sleper breached the covenant by joining FBN less than one year after he left the company. Nor have Defendants argued that the covenant not to compete is invalid as a matter of law. *See generally Med. Staffing Network, Inc. v. Ridgway*, 670 S.E.2d 321, 327 (N.C. Ct. App. 2009).

usually means to "involve oneself" or to "participate"—*i.e.*, to "be active" in some way. *Engage*, Am. Heritage Dictionary of the Eng. Language, https://ahdictionary.com/word/search.html?q=engage (last visited Feb. 22, 2021); *Participate*, Am. Heritage Dictionary of the Eng. Language, https://ahdictionary.com/word/search.html?q=participate (last visited Feb. 22, 2021). And a "consultant" is one who "gives expert or professional advice." *Consultant*, Am. Heritage Dictionary of the Eng. Language, https://ahdictionary.com/word/search.html?q=consultant (last visited Feb. 22, 2021). With these definitions in mind, it seems apparent that Sleper would only breach the noncompete provision if, by rendering professional advice, he was actively participating in FBN's efforts to develop new seed products. Absent an element of active, present participation, any hypothetical discussions about a future business relationship—even discussions that involved the use or disclosure of Syngenta information—would not be enough. *Cf. Dalton v. Camp*, 519 S.E.2d 82, 87 (N.C. Ct. App. 1999) (holding that an employee does not breach the common law duty of loyalty by "[m]erely preparing to compete" with her employer).

On this record, Syngenta has not plausibly alleged any active participation. To be sure, the months-long back-and-forth between Sleper and FBN does not seem like a typical interview process, but there are no allegations that Sleper actually participated in efforts to develop new seed products or services for FBN while he was still employed at Syngenta. Instead, the discussions focused on the nature of Sleper's then-hypothetical future role at FBN and how he could use his skills to develop a new seed-breeding program. *See* Second Am. Compl. ¶¶ 47, 49–51. Indeed, the Complaint says that FBN did not actually begin its

new "pilot program" until the "2020 season," and it did not announce its "Independent Breeding Network" until December 2020, months after Sleper had left Syngenta. *Id.* ¶¶ 13, 72. In short, Syngenta has plausibly alleged that Sleper breached his Employment Agreement in other ways, but not that he breached his covenant not to compete.

## VI

Syngenta also alleges that FBN and Sleper misappropriated its trade secrets, and it asserts claims under both the DTSA and the NCTSPA. Second Am. Compl. ¶¶ 95–116.[7] Defendants argue that Syngenta has not identified any trade secrets with enough specificity or plausibly alleged that any misappropriation occurred. Defs.' Mem. at 17–20.

When, as here, a plaintiff brings parallel claims under the DTSA and a state trade-secret statute, courts will commonly analyze those claims together. *See Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 967 (D. Minn. 2018) (addressing claims under the DTSA and Minnesota Uniform Trade Secrets Act and noting the statutes' "functionally equivalent definitions"). Usually, this makes sense. The DTSA is largely "modeled on the Uniform Trade Secrets Act [UTSA], versions of which have been adopted by 48 states." *Heska Corp. v. Qorvo US, Inc.*, No. 1:19CV1108, 2020 WL 5821078, at *4 (M.D.N.C. Sept. 30, 2020) (quoting H.R. Rep. No. 114-529, at 199 (2016)). Because North Carolina is one of only two states that has not adopted the UTSA, however, it is not clear that the combined approach is appropriate when the NCTSPA is involved. *See id.* at *4–9 (analyzing claims under the DTSA and similar Michigan and Minnesota statutes together

---

[7]  Syngenta asserts claims under both the NCTSPA and the DTSA against Sleper, but only a claim under the DTSA against FBN. *See id.*

but separately analyzing a claim under the NCTSPA).  Nonetheless, most of the Parties' arguments in this case do not implicate any differences between the DTSA and the NCTSPA.  For that reason, they will be applied together, and any notable differences will be highlighted along the way.

A

Start with the argument that Syngenta has not plausibly alleged the existence of trade secrets.  The DTSA and NCTSPA define a "trade secret" as, essentially, "business or technical information" that (1) is the subject of "reasonable efforts" to maintain its secrecy and (2) derives "actual or potential" "independent economic value" from not being "generally known or readily ascertainable."   N.C. Gen. Stat. § 66-152(3); 18 U.S.C. § 1839(3); *see CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018); *Prometheus Grp. Enters., LLC v. Viziya Corp.*, No. 5:14-CV-32-BO, 2014 WL 3854812, at *7 (E.D.N.C. Aug. 5. 2014).  Defendants do not argue that Syngenta fails to meet these requirements—*i.e.*, that it has failed to allege the existence of information that derives value from being secret or that it has taken insufficient measures to protect that information. Instead, Defendants argue that Syngenta has not described its alleged trade secrets with enough specificity.  Defs.' Mem. at 17.

Under both statutes, "a plaintiff must identify a trade secret with sufficient particularity[.]"  *Krawiec v. Manly*, 811 S.E.2d 542, 547–48 (N.C. 2018); *see Integrated Process Sols., Inc. v. Lanix LLC*, No. 19-cv-567 (NEB/LIB), 2019 WL 1238835, at *4 (D.

26

Minn. Mar. 18, 2019).[8]  This does not mean that a plaintiff in a trade-secret case must comply with the strictures of Federal Rule of Civil Procedure 9(b) (unless, of course, the plaintiff's claims are premised on fraudulent conduct).  *See Garcia v. Vertical Screen, Inc.*, Civ. No. 19-3184, 2020 WL 2615624, at *2 & n.1 (E.D. Pa. May 22, 2020).  Instead, this "particularity" requirement appears to reflect a judicial effort to balance two interests that have special importance in trade-secret cases.  On one hand, trade-secret statutes protect only a subset of valuable and confidential business information, and a plaintiff must give defendants fair notice of what it thinks meets the statutory definition.  *See Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, No. 17-cv-5009 (JRT/KMM), 2019 WL 7838280, at *9 (D. Minn. Sept. 12, 2019); *see also Volt Power, LLC v. Butts*, No. 7:19-cv-149-BO, 2020 WL 3979659, at *4 (E.D.N.C. July 14, 2020).  At the same time, including too much detail "would paradoxically jeopardize the plaintiff's ability to protect its trade secrets."  *Protégé Biomedical, LLC v. Z-Medica, LLC*, 394 F. Supp. 3d 924, 939 (D. Minn. 2019) (internal quotation marks and citation omitted); *see Krawiec*, 811 S.E.2d at 611–12 (acknowledging this concern).  So, while a complaint need not "precisely describe all of the reasons" that a plaintiff's information is a trade secret, *Superior Edge, Inc.*, 964 F. Supp. 2d at 1042, it also may not describe the alleged trade secrets with only "general allegations in sweeping and conclusory statements," *Washburn v. Yadkin Valley Bank & Tr. Co.*, 660 S.E.2d 577, 585–86 (N.C. Ct. App. 2008).

---

[8]     Neither Party argues that the degree of specificity required differs between the DTSA and NCTSPA.

The Second Amended Complaint describes at least some trade secrets with enough particularity for the pleading stage. Syngenta provides an extensive list of the types of confidential information that it maintains as part of its seed-breeding business, including things like "data generated from pan-genomic analytics using DNA sequence data," "genetic maps," and "molecular marker (genotyping) data." Second Am. Compl. ¶ 24. It also identifies "examples of the information taken" by Warner and Sleper when they left the company, which included "[d]atasets about Syngenta's North America breeding program for corn and soy" as well as "trial data" and "results of the analytics" for a "[c]orn drought program for Syngenta Artesian product pipeline." Second Am. Compl. ¶ 76. It is undoubtedly plausible that this type of competitive information would derive value from its secrecy, and Syngenta extensively describes the security measures that it took to protect it. *Id.* ¶¶ 77–78, 80–84; *see N. Am. Deer Registry, Inc. v. DNA Sols., Inc.*, Civ. No. 4:17-CV-00062, 2017 WL 2402579, at *7–8 (E.D. Tex. June 2, 2017) (holding that a plaintiff's "deer genetic information," which included "biological materials" and "genotype analysis data," amounted to trade secrets). To be sure, Syngenta uses somewhat broad strokes to describe its information, and for the most part, it does not name specific files or products taken. But courts have accepted similar levels of generality at the pleading stage. *See, e.g.*, *Stratasys, Inc. v. Krampitz*, No. 17-cv-5524 (DSD/HB), 2018 WL 2247265, at *3 (D. Minn. May 16, 2018) (denying a motion to dismiss when a plaintiff identified, among other things, "CAD files (3D drawings), proposals, machine pricing . . . , margins, material pricing, staffing and consulting rates, [and] proprietary spreadsheets and software"); *Deluxe Fin. Servs., LLC v. Shaw*, No. 16-cv-3065 (JRT/HB), 2017 WL

3327570, at *1, 3 (D. Minn. Aug. 3, 2017) (denying a motion to dismiss when a plaintiff identified "customer pricing data, production costs, check unit volumes, profitability, sales analyses, sales strategies, deal structures, sales plans, 'key account' data, check program management techniques, and account details"); *cf. Washburn*, 660 S.E.2d at 586 (holding that "business methods; clients, their specific requirements and needs; and other confidential information pertaining to [plaintiff's] business" was not enough).

Although Syngenta has plausibly alleged the existence of some trade secrets, other allegations are not so specific. Most notably, it claims that the BreedingPlanCosts PDF that Sleper created and sent to FBN contained trade secrets that it identifies as "information related to breeding values and genotyping" and information "regarding early-stage breeding practices at Syngenta." *Id.* ¶¶ 52–56. As noted above, the PDF appears to outline high-level plans and budgeting for a hypothetical breeding program, but it does not mention Syngenta, nor does it seem to contain any actual breeding data or analytics related to Syngenta's breeding program. *See* ECF No. 72. Considered alongside the document itself, Syngenta's allegations about its contents seem more like the vague and "sweeping" statements that courts have found insufficient. *AECOM Tech. Corp. v. Keating*, No. 11 CVS 9225, 2012 WL 370296, at *2–3 (N.C. Super. Ct. Feb. 6, 2012); *see also Washburn*, 660 S.E.2d at 586; *Volt Power*, 2020 WL 3979659, at *4. Without some more specific identification of what in the document deserves protection, Syngenta has not plausibly alleged that the BreedingPlanCosts PDF contains trade secrets.

B

Next, Defendants argue that Syngenta has not plausibly alleged that any trade secrets were misappropriated. Under the NCTSPA, "[m]isappropriation" means "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent[.]" N.C. Gen. Stat. § 66-152(1). The DTSA's definition, although similar, is more complicated. Under that statute, misappropriation can occur through "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). It can also occur, as relevant here, through

> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> > (i) used improper means to acquire knowledge of the trade secret; [or]
> >
> > (ii) at the time of the disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
> >
> > > (I) derived from or through a person who had used improper means to acquire the trade secret;
> > >
> > > (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit [its] use . . .; or
> > >
> > > (III) derived from or through a person who owed a duty to the person seeking relief to maintain [its] secrecy[.]

*Id.* § 1839(5)(B). "[I]mproper means," in turn, "include[] theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]" *Id.* § 1839(6)(A).

Several principles help illustrate how to apply these definitions to this case. A plaintiff must generally do more than allege that a former employee who had access to its trade secrets left to work for a competitor.[9] *See CH Bus Sales, Inc. v. Geiger*, No. 18-cv-2444 (SRN/KMM), 2019 WL 1282110, at *10 (D. Minn. Mar. 20, 2019) (stating that "[m]ere fears" that a former employee might have taken undefined trade secrets and that a new employer might use them does not give rise to a plausible misappropriation claim). In that scenario, the employee has typically acquired the trade secrets with her employer's permission, so there has been no improper acquisition, use or disclosure. Second, even when an employee has retained trade secrets after leaving, there may be no "misappropriation" absent an allegation that the employee has acquired them improperly or used or disclosed them in her new employment. *See CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 810 (D. Minn. 2018) (concluding that a plaintiff was unlikely to succeed on the merits of a DTSA claim where a departing employee had forwarded emails containing alleged trade secrets to his personal email account because no policy prohibited

---

[9] Under some circumstances, a plaintiff asserting a misappropriation claim may be entitled to relief on an "inevitable disclosure" theory—*i.e.*, by showing that the "defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1457 (M.D.N.C. 1996) (quoting *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995)); *see Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 969 (D. Minn. 2018) (noting that plaintiffs must meet a "high bar" to show that disclosure would be inevitable). Syngenta has not pursued an inevitable-disclosure theory here.

the email forwards and there was no evidence of use or disclosure); *cf. AUA Priv. Equity Partners, LLC v. Soto*, No. 1:17-cv-8035-GHW, 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5, 2018) (concluding that a plaintiff had plausibly alleged that an employee had misappropriated trade secrets by uploading them to a personal cloud-based storage system "in direct violation of [] confidentiality agreements"). Misappropriation is plausible, however, when a departing employee has retained trade secrets under suspicious circumstances and there is reason to believe that the employee has used or disclosed the trade secrets in her new employment. *See, e.g., Volt Power, LLC*, 2020 WL 3979659, at *4 (holding that a departing employee plausibly misappropriated trade secrets by taking them "without consent following his resignation" and using them in his new employment); *Protégé Biomedical, LLC*, 394 F. Supp. 3d at 939–40; *Stratasys, Inc. v. Krampitz*, No. 17-cv-5524 (DSD/HB), 2018 WL 2247265, at *3 (D. Minn. May 16, 2018); *Deluxe Fin. Servs., LLC v. Shaw*, No. 16-cv-3065 (JRT/HB), 2017 WL 3327570, at *4 (D. Minn. Aug. 3, 2017); *see also Arthur J. Gallagher & Co. v. Tarantino*, __ F. Supp. 3d __, No. 20-cv-05505-EMC, 2020 WL 6415272, at *11–12 (N.D. Cal. Nov. 2, 2020); *Kraus USA, Inc. v. Magarik*, No. 17-CV-6541 (ER), 2020 WL 2415670, at *6–7 (S.D.N.Y. May 12, 2020). And, significantly, surrounding circumstances may give rise to a reasonable inference of misappropriation at the pleading stage even without a direct allegation of a specific use or disclosure. *See Heska Corp.*, 2020 WL 5821078, at *7, 9.

Under the specific circumstances of this case, Syngenta has plausibly alleged under both statutes that Sleper misappropriated at least some of its trade secrets. Several facts, taken collectively, support this conclusion. Sleper's role with Syngenta gave him "access

to [its] confidential and trade secret information," and he agreed to broad confidentiality obligations. Second Am. Compl. ¶ 12. Over many months, he discussed the prospect of building a competing seed breeding program at FBN while he was still creating and maintaining trade-secret information at Syngenta. During that time, he attended a face-to-face meeting with Wulfkuhle, a former Syngenta employee, who reported that Sleper shared "great ideas" about "genomics and phenomics." *Id.* ¶¶ 49–50. Just before his departure from Syngenta, Sleper accessed alleged trade secret information and engaged in "behavior consistent with copying [the] data," but, despite his contractual obligations to return Syngenta's property, he did not leave any of his external storage devices behind. *Id.* ¶¶ 69, 72, 76. He then joined FBN, and over the next several months, FBN announced a "new Independent Breeding Network" and "executed a pilot program . . . to test germplasm and try out breeding combinations," *id.* ¶ 13, activities that undoubtedly would have benefitted from the types of data that Sleper allegedly took. On these facts, it is plausible that Sleper used or disclosed Syngenta's trade secrets "without express or implied authority or consent," N.C. Gen. Stat. § 66-152(1), and knowing that he had acquired the trade secrets "under circumstances giving rise to a duty to maintain [their] secrecy." 18 U.S.C. § 1839(5)(B)(ii).

For similar reasons, Syngenta has plausibly alleged that FBN misappropriated its trade secrets under the DTSA. Wulfkuhle, who was Sleper's main point of contact at FBN, was a former Syngenta employee who presumably knew the nature of Sleper's confidentiality obligations and the types of Syngenta information that he could access. Second Am. Compl. ¶¶ 46, 118. With this knowledge, FBN engaged in a months-long

back-and-forth with Sleper—including a face-to-face meeting—about building a seed-breeding program to compete with Syngenta. Along the way, FBN employees internally shared information they had learned from Warner and Sleper. *Id.* ¶¶ 50, 62. And shortly after Sleper joined FBN (while allegedly retaining Syngenta's trade secrets without permission), FBN announced new developments in its seed breeding program. *Id.* ¶ 13. Although there are no direct allegations that Sleper disclosed a specific piece of trade-secret information at a specific time, Syngenta's allegations make it plausible that FBN acquired its trade secret information from Sleper "without express or implied consent" and used that information knowing that Sleper had a "duty . . . to maintain [its] secrecy." 18 U.S.C. § 1839(5)(B)(ii).

Defendants frame the facts differently. They argue that the communications between FBN and Sleper were benign; that their discussions about a new seed-breeding program were hypothetical, forward-looking, and unrelated to Sleper's role at Syngenta; and that FBN has not used any protected Syngenta information. *See* Defs.' Mem. at 19. This is a plausible interpretation of the record, but it is not the only one. *See Arthur J. Gallagher & Co.*, __ F. Supp. 3d __, 2020 WL 6415272, at *11. At this stage, Syngenta has done enough to avoid dismissal of its trade-secret claims.

VII

Next, Syngenta claims that FBN and Sleper tortiously interfered with its contracts. *See* Second Am. Compl. ¶¶ 117–31. Defendants argue that Syngenta's claim is both legally impossible and factually implausible. *See* Defs.' Mem. at 22–24.[10]

A

Defendants' first argument rests on a flawed framing of Syngenta's claim. According to Defendants, Syngenta is attempting to "bootstrap[]" Sleper into liability for interfering with his own contract because the alleged tortious interference was all part of one conspiracy among the three Defendants to misappropriate Syngenta's trade secrets. Defs.' Mem. at 23 (citation omitted). This legal theory would not work, Defendants argue, because "a party to a contract cannot tortiously interfere with that contract." *McLucas v. Home Depot U.S.A., Inc.*, No. 5:19-CV-437-FL, 2020 WL 6326097, at *4 (E.D.N.C. Oct. 28, 2020) (citation omitted).[11] But Defendants' argument ignores the legal theory that Syngenta has pursued, which is that there are really four separate tortious-interference claims here: one against Sleper for interfering with Warner's contract, one against Warner

---

[10]    Two of Defendants' arguments on this claim do not require much discussion. First, Syngenta mooted the argument that it lacks standing to assert interference with the contracts when it alleged in the Second Amended Complaint that it is the legal successor to Syngenta Seeds, Inc. Second Am. Compl. ¶ 8. Second, Defendants' argument that this claim is preempted by either the Minnesota or California trade-secret statute fails because the NCTSPA—which does not contain a preemption provision—applies.

[11]    Of course, this argument would not provide a basis to dismiss the tortious-interference claim against FBN because FBN was not a party to either Employment Agreement.

for interfering with Sleper's contract, and two against FBN for interfering with Warner's and Sleper's contracts, respectively. Second Am. Compl. ¶¶ 122–24. In other words, Syngenta does not claim that Sleper interfered with his own contract or conspired to do so.

Defendants also seem to raise a separate but similar argument: that the tortious-interference claim against Sleper fails because he could not wrongfully interfere with a co-employee's contract. Defs.' Mem. at 23 (citing *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 507 (Minn. 1991)). Neither Minnesota law (which Defendants cite) nor North Carolina law supports this broad argument. Under *Nordling*, an employee is "privileged to interfere with . . . another employee's employment contract . . . if that person acts in good faith, . . . believing that his actions are in furtherance of the company's business." 478 N.W.2d at 507. Similarly, under North Carolina law, "[w]hen a tortious interference claim based on an employment contract is brought against the plaintiff's co-employee[], the plaintiff must show that the alleged interference was unrelated to a legitimate business interest of the employee." *Schwarz v. St. Jude Med., Inc.*, 842 S.E.2d 119, 127 (N.C. Ct. App. 2020) (internal quotation marks and citation omitted). If these principles apply when, as here, the plaintiff is the employer itself, they still do not require dismissal. Syngenta alleges that Sleper interfered with Warner's employment contract to help Syngenta's competitor, not to further Syngenta's business interests.

B

The question, then, is whether Syngenta has plausibly alleged actionable interference. In order to succeed on its tortious-interference claims at this stage, Syngenta must plausibly allege that FBN "intentionally induce[d]" Warner and Sleper to breach their

Employment Agreements and that Sleper "intentionally induce[d]" Warner to breach his. *Eli Rsch., Inc. v. United Commc'ns Grp., LLC*, 312 F. Supp. 2d 748, 756 (M.D.N.C. 2004). But it must also plausibly allege that, in doing so, FBN and Sleper "act[ed] without justification." *Beverage Sys., LLC*, 784 S.E.2d at 462.

First, there are no significant allegations that Sleper induced Warner to breach his Employment Agreement. Indeed, the complaint suggests that Warner—who was apparently senior to Sleper in the Syngenta hierarchy—took the lead in contacting FBN on behalf of the two men. *See* Second Am. Compl. ¶¶ 46–47, 49. The allegations show that Warner and Sleper acted parallel to one another, accessing and taking confidential information, *see id.* ¶¶ 47, 49, 52–54, 64–66, 69–71, but there is no reason to believe that Sleper's actions had any effect on Warner's. The only potential indicator of influence occurred in October 2019—while both men were still employed at Syngenta—when Sleper texted Warner, "We should try to find some more data[.]" *Id.* ¶ 59. Syngenta frames this as a suggestion that the two men "mine more Syngenta Confidential Information for FBN," *id.*, but no factual allegations support this framing or otherwise make it plausible that Sleper was enticing Warner to breach his contractual obligations to Syngenta when he sent that text message.

There are different problems with the tortious-interference claim against FBN. The gist of this claim is that FBN "dangled the prospect of new jobs in front of" Warner and Sleper in order to obtain Syngenta's confidential data and gain an unlawful competitive advantage. *Id.* ¶ 6. Syngenta has plausibly alleged that FBN was aware of the men's contractual obligations; after all, FBN had recently hired at least two other former Syngenta

employees who were presumably under similar obligations. *See id.* ¶ 118. But it is not reasonable to infer from the complaint that FBN induced Warner and Sleper to breach their duties to maintain confidentiality and to return Syngenta's property. First, Warner apparently initiated the communications about building a new seed-breeding program at FBN. *Id.* ¶ 46. FBN did not request the meeting with Warner and Sleper in Albert Lea, nor did it apparently take any action to induce Warner and Sleper to divulge confidential information in that meeting. After the meeting, FBN "reassured" the two men that it "anticipated moving forward with [them]" and encouraged them to "think about [their] ideal role profiles," but it mentioned nothing about Syngenta's confidential information. *Id.* ¶¶ 51, 57. Finally, Syngenta does not allege that FBN did anything to encourage Warner and Sleper to save Syngenta's confidential information on external storage devices and keep that information after their departure from the company. Moreover, because Syngenta has not plausibly alleged that Sleper breached his noncompete obligations, it has, at most, alleged that FBN induced Warner to breach his covenant not to compete.

It is not necessary to decide whether Syngenta has plausibly alleged that FBN induced a breach of Warner's non-compete, however, because either way, Syngenta has not alleged that FBN acted "without justification." *Beverage Sys., LLC*, 784 S.E.2d at 462. As North Carolina courts have consistently held, "[c]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interest and by means that are lawful." *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 827 S.E.2d 458, 476 (N.C. 2019) (quoting *Peoples Sec. Life Ins. Co. v. Hooks*, 367 S.E.2d 647, 650 (N.C. 1988)). "The recruitment of employees from

38

a business competitor is presumptively privileged competitive activity, absent an allegation of legal malice." *Id.* at 477. "Legal malice" in this context means "intentionally doing a wrongful act or exceeding one's legal right or authority," and the act "must be taken with the design of injuring one of the parties to the contract or of gaining some advantage at the expense of a party." *Murphy v. McIntyre*, 317 S.E.2d 397, 401 (N.C. Ct. App. 1984). "To survive dismissal, a complaint alleging tortious interference 'must admit of no motive for interference other than malice.'" *Movement Mortg., LLC v. McDonald*, No. 3:17-CV-716-RJC-DSC, 2018 WL 6733953, at *5 (W.D.N.C. Nov. 6, 2018) (quoting *Pinewood Homes, Inc. v. Harris*, 646 S.E.2d 826, 832–33 (N.C. Ct. App. 2007)), *report and recommendation adopted*, 2019 WL 452773, at *1 (W.D.N.C. Feb. 5, 2019). To be sure, Syngenta makes some conclusory assertions that FBN intended to injure it. Second Am. Compl. ¶ 125. But even after expedited discovery, the facts pleaded in support of these assertions do not plausibly show that FBN was "motivated by anything other than an interest in successfully competing against" Syngenta. *Link*, 827 S.E.2d at 477; *see also 360 Mortg. Grp., LLC. v. Stonegate Mortg. Corp.*, No. 5:14-CV-310-F, 2016 WL 4943933, at *8 (E.D.N.C. Sept. 14, 2016) (granting summary judgment to defendant under similar circumstances); *cf. McDonald*, 2018 WL 6733953, at *6 (denying motion to dismiss where plaintiff plausibly alleged that a former employee remained employed, even after starting to work for a competitor, in order to "gather trade secrets and confidential information and to recruit employees to follow him"). For these reasons, Syngenta's tortious-interference claims against Sleper and FBN will be dismissed.

VIII

Syngenta also claims that FBN violated the California Unfair Competition Law, which prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200. According to Syngenta, FBN engaged in unfair business practices by interfering with its contractual relationships and by misappropriating its confidential information. Second Am. Compl. ¶¶ 132–36. After first hinting that California law should not apply to this claim, Defendants argue that Syngenta has not alleged the requisite economic injury and that the claim is nonetheless preempted. Defs.' Mem. at 24–27.

Defendants first suggest that California law should not apply at all, and specifically, that it is "opportunistic[]" for Syngenta to argue that North Carolina law applies to some of its claims and then to invoke California law for this one. Defs.' Mem. at 24; Defs.' Reply Mem. at 13. As Syngenta points out, however, courts have allowed claims under the California Unfair Competition Law as long as some of the wrongful conduct occurred in California, even when a plaintiff asserts statutory and tort claims under the laws of other states. *See Inteliquent, Inc. v. Free Conferencing Corp.*, __ F. Supp. 3d __, No. 16-cv-6976, 2020 WL 7027583, at *15–16 (N.D. Ill. Nov. 30, 2020); *TruePosition, Inc. v. Sunon, Inc.*, No. 05-cv-3023, 2006 WL 1451496, at *5–6 (E.D. Pa. May 25, 2006). Syngenta alleges that FBN is headquartered in California. Second Am. Compl. ¶ 13. It also argues that FBN received and used "Warner's and Sleper's wrongful assistance" in California by using the BreedingPlanCosts PDF and that Warner "traveled to FBN as part of the scheme." Pl.'s Mem. at 40; *see* Second Am. Compl. ¶¶ 62–63. These latter allegations do not

explicitly state that the conduct in question occurred in California, but it seems reasonable to infer that it did.[12]

Next, Defendants argue that Syngenta has not alleged the requisite economic injury to state a claim under the UCL. *See* Cal. Bus. & Prof. Code § 17204 (providing that only those who have "lost money or property as a result of the unfair competition" may sue under the UCL); *see also Stoba v. Saveology.com, LLC*, No. 13-cv-2925-BAS (NLS), 2014 WL 3573404, at *4 (S.D. Cal. July 18, 2014). A plaintiff can show an economic injury in "innumerable ways"—some more tangible than others. *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 885 (Cal. 2011). For example, a plaintiff might "surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have" or "have a present or future property interest diminished." *Id.* at 885–86. "'[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice' at the pleading stage." *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1162 (C.D. Cal. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Syngenta's allegations, while somewhat sparse, make an economic injury at least plausible. Its conclusory statement that FBN's actions "have caused and continue to cause economic injury to" it is not entitled to a presumption of truth, Second Am. Compl. ¶ 135; *see Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009), but taken as a whole, the complaint

---

[12]    No Party argues that this claim, which seems to be based on essentially the same conduct as Syngenta's other claims against FBN, is "closely related" to Sleper's Employment Agreement, such that the North Carolina choice-of-law provision should govern. *Nw. Airlines*, 111 F.3d at 1392.

does more.  Syngenta has plausibly alleged that FBN misappropriated trade secrets that it spent millions of dollars to develop.  Second Am. Compl. ¶ 9.  Under the circumstances, it is plausible that Syngenta's "property interest" in those trade secrets was "diminished." *Kwikset Corp.*, 246 P.3d at 885–86; *see Fields v. QSP, Inc.*, No. CV 10-5772 CAS (SSx), 2011 WL 1375286, at *6 (C.D. Cal. Apr. 8, 2011) (holding that an alleged misappropriation of trade secrets was "sufficient to establish a loss of property"); *see also Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 153 Cal. Rptr. 3d 865, 879 (Cal. Ct. App. 2013) (holding that less tangible injuries like "lost business" and the diminished "value of [a] law practice" can suffice as injuries under the UCL).[13]

Finally, Defendants argue that Syngenta's UCL claim is preempted by the California Uniform Trade Secrets Act, which, like the MUTSA, "supersede[s] other civil remedies 'based upon misappropriation of a trade secret.'" *Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27, 51 (Cal. Ct. App. 2010) (quoting Cal. Civil Code § 3426.7), *abrogated on other grounds by Kwikset*, 246 P.3d 877.  The CUTSA preempts a claim under the UCL that "relies on the same facts as [a] misappropriation claim." *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Ops., Inc.*, 90 Cal. Rptr. 3d 247, 263 (Cal. Ct. App. 2009) (citation omitted).[14]

---

[13]    Defendants also appear to argue that Syngenta lacks standing under the UCL because it has not plausibly alleged that it will be able to recover restitution. Defs.' Mem. at 26.  The California Supreme Court has held that ineligibility for restitution is not a basis to deny standing under the UCL because the two issues are "wholly distinct." *Kwikset Corp.*, 246 P.3d at 894–95.

[14]    One might reasonably wonder why the CUTSA would preempt the UCL claim when the NCTSPA—which does not have a preemption provision—governs Syngenta's

This argument has merit. According to Syngenta, its UCL claim is not preempted because it sweeps more broadly than the misappropriation of trade secrets. Pl.'s Mem. at 40. Specifically, it alleges that FBN's "unfair business acts or practices" include both "tortious interference with [its] valid contractual relationships and misappropriation of confidential information." Second Am. Compl. ¶ 134. There are two problems with this argument. First, as discussed above, Syngenta has not plausibly alleged that FBN wrongfully interfered with Warner's and Sleper's contracts. Second, under California law, Syngenta cannot avoid preemption by claiming that FBN misappropriated confidential information that does not rise to the level of a trade secret. To do so, it would have to "allege wrongdoing materially distinct from the wrongdoing alleged in" its trade-secret claim. *Waymo LLC v. Uber Techs., Inc.*, 256 F. Supp. 3d 1059, 1062–64 (N.D. Cal. 2017). Nowhere does Syngenta distinguish between FBN's conduct with respect to its alleged trade secrets and FBN's conduct with respect to its other, non-trade-secret information. In other words, Syngenta's UCL claim will be dismissed because it "relies on the same facts as [its] misappropriation claim." *K.C. Multimedia, Inc.*, 90 Cal. Rptr. 3d at 263.

---

statutory trade-secret claim. But the Parties do not address this issue, and other courts have appeared to rely on the CUTSA's preemption provision even when some other state's law governs a plaintiff's misappropriation claim. *See You Map, Inc. v. Snap Inc.*, No. 20-162-CFC, 2021 WL 106498, at *8–10 (D. Del. Jan. 12, 2021), *report and recommendation adopted*, 2021 WL 327388 (D. Del. Feb. 1, 2021); *AirWatch LLC v. Mobile Iron, Inc.*, No. 1:12-cv-3571-JEC, 2013 WL 4757491, at *3, 6 (N.D. Ga. Sept. 4, 2013). The CUTSA's preemption provision will therefore be applied here.

IX

Syngenta's final claim is that Warner, Sleper, and FBN engaged in a "civil conspiracy" to unlawfully harm it. Second Am. Compl. ¶¶ 137–39. Under North Carolina law, civil conspiracy "is not a separate civil action[.]" *Dove v. Harvey*, 608 S.E.2d 798, 800 (N.C. Ct. App. 2005). Instead, it is a theory of liability, premised on an underlying tortious act, that allows a plaintiff to "associate [multiple] defendants together and perhaps liberalize the rules of evidence to the extent that under the proper circumstances the acts of one may be admissible against all." *Krawiec*, 811 S.E.2d at 613 (quoting *Henry v. Deen*, 310 S.E.2d 326, 334 (N.C. 1984)). The elements are "(1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *Id.* at 614 (citation omitted). Defendants do not frame their arguments around these elements. They argue that the conspiracy claim fails because it is not a standalone cause of action, because it is preempted, and because Syngenta has not plausibly alleged any underlying wrongful acts to support it. Defs.' Mem. at 27; Defs.' Reply Mem. at 14–15. Syngenta responds that its conspiracy claim is not preempted and that it should survive because the other claims do. Pl.'s Mem. at 42–43.

At this stage, and given the relative lack of briefing on the question, Syngenta has the better arguments. First, although Defendants are correct that there is no freestanding cause of action for civil conspiracy, North Carolina courts consistently allow plaintiffs to raise it as a separate count in their complaints, *see, e.g.*, *PDF Elec. & Supply Co. v. Jacobsen*, No. 20 CVS 4609, 2020 WL 5415220, at *4, 11 (N.C. Super. Ct. Sept. 9, 2020), so civil conspiracy's status as a theory of liability rather than a cause of action is not reason

enough to dismiss the claim. Second, Defendants' argument that the civil-conspiracy claim is preempted rests entirely on their conclusion that either the MUTSA or CUTSA should govern Syngenta's statutory trade-secret claim. *See* Defs.' Mem. at 27 n.7. As noted above, however, the NCTSPA—which has no preemption provision—governs the state trade-secret claims in this case. Finally, Syngenta has plausibly alleged that Sleper and FBN misappropriated its trade secrets. Because that claim provides an underlying tort, and because Defendants have not challenged any other elements of the conspiracy claim at this stage, dismissal would be inappropriate. *See Eli Rsch., Inc.*, 312 F. Supp. 2d at 757, 763–64 (denying a motion to dismiss under similar circumstances); *PDF Elec. & Supply Co.*, 2020 WL 5415220, at *11 (same).

## X

The only remaining question is whether the dismissal of Syngenta's tortious-interference and UCL claims should be without prejudice to give Syngenta an opportunity to amend its complaint. *See* Pl.'s Mem. at 43. "Federal courts have disagreed to some extent over whether a dismissal under Rule 12(b)(6) is 'normally one with prejudice or without prejudice,'" but courts "ultimately have discretion to decide between" the two. *Miles v. Simmons Univ.*, No. 20-cv-2333 (ECT/KMM), 2021 WL 195798, at *7 (D. Minn. Jan. 20, 2021) (citation omitted). "A dismissal with prejudice is typically appropriate when a plaintiff has shown persistent pleading failures despite one or more opportunities to amend . . . or when the record makes clear that any amendment would be futile. *Id.* (internal quotation marks and citations omitted). But when a plaintiff's claims "might conceivably be repleaded with success," a without-prejudice dismissal may be the better

option.  *Washington v. Craane*, No. 18-cv-1464 (DWF/TNL), 2019 WL 2147062, at *5 (D. Minn. Apr. 18, 2019), *report and recommendation adopted*, 2019 WL 2142499 (D. Minn. May 16, 2019).

Several factors arguably weigh in favor of dismissing Syngenta's claims with prejudice.  Syngenta has already amended its complaint twice, and it has had the chance to conduct limited discovery.  This may diminish the probability that more discovery will allow Syngenta to plausibly replead the dismissed claims.  Nonetheless, discovery will proceed on Syngenta's remaining claims.  The Parties are currently engaged in several contentious discovery disputes, *see* ECF Nos. 102, 108, 138, and the late-breaking revelations about Sleper's alleged destruction of Syngenta property have already shown that expedited discovery did not reveal all relevant information, *see* ECF No. 94; *supra* n.5. All of this suggests that new information implicating Sleper and FBN could come to light. *See Miles*, 2021 WL 195798, at *7.  Under these circumstances, the better answer is to dismiss Syngenta's deficient claims without prejudice.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants Farmer's Business Network and Joshua Sleper's Motion to Dismiss [ECF No. 61] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. The motion is **GRANTED** with respect to Counts IV and V of the Second Amended Complaint [ECF No. 69] and those counts are **DISMISSED WITHOUT PREJUDICE**.

2. The motion is **DENIED** in all other respects.


Date: February 22, 2021

s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court